James P. KARTELL, M.D., et al.,
Plaintiffs, Appellees,

v.

BLUE SHIELD OF MASSACHUSETTS,
INC., Defendant, Appellant.

James P. KARTELL, M.D., et al.,
Plaintiffs, Appellees,

v.

BLUE SHIELD OF MASSACHUSETTS,
INC., et al., Defendants, Appellees.

Massachusetts Medical Society, et al.,
Intervenors/Plaintiffs, Appellants.

James P. KARTELL, M.D., et al.,
Plaintiffs, Appellees,

v.

BLUE SHIELD OF MASSACHUSETTS,
INC., et al., Defendants, Appellees.

Commissioner of Insurance,
Intervenor/Defendant,
Appellant.

Nos. 84–1241, 84–1290 and 84–1303.

United States Court of Appeals,
First Circuit.

Argued Sept. 14, 1984.

Decided Nov. 28, 1984.

Daniel O. Mahoney, Boston, Mass., with whom Douglas H. Wilkins, Arthur P. Kreiger, Palmer & Dodge, and Reginald H. Howe, Boston, Mass., were on brief, for Blue Shield of Massachusetts, Inc., et al.

Helen E. Witt, James W. Rankin, Jack A. Rovner, Kirkland & Ellis, Marvin C. Reiter, Mary Ader, Chicago, Ill., on brief, for Blue Cross and Blue Shield Association, amicus curiae.

John R. Phillips, and Richard B. Rogers, Detroit, Mich., were on brief, for Ford Motor Company, amicus curiae.

H. Reed Witherby, Asst. Atty. Gen., Government Bureau, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Donna Arzt, Asst. Atty. Gen., Public Protection Bureau, Boston, Mass., were on brief, for Massachusetts Com'r of Ins.

Thayer Fremont-Smith, Boston, Mass., with whom Kenneth Laurence, Lee T. Gesmer, Michael K. Loucks, and Choate, Hall & Stewart, Boston, Mass., were on brief, for Massachusetts Medical Society, et al.

Kirk B. Johnson, Chicago, Ill., with whom, B.J. Anderson, American Medical Association, Newton N. Minow, Jack R. Bierig, Jeffrey R. Tone, James C. Dechene, and Sidley & Austin, Chicago, Ill., were on brief, for American Medical Association, amicus curiae.

Catherine W. Hantzis, Boston, Mass., on brief for Consumer Health Advocates, Inc., amicus curiae.

James vanR. Springer, Washington, D.C., with whom Dickstein, Shapiro & Morin, Washington, D.C., Stanley V. Ragalevsky, Christopher E. Nolin, and Warner & Stackpole, Boston, Mass., were on brief, for James P. Kartell, M.D., et al.

Before CAMPBELL, Chief Judge, COWEN,[*] Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Blue Shield pays doctors for treating patients who are Blue Shield health insurance subscribers, but only if each doctor promises not to make any additional charge to the subscriber. The basic issue in this case is whether this Blue Shield practice—called a "ban on balance billing"—violates either Sherman Act § 1 forbidding agreements "in restraint of trade," 15 U.S.C. § 1, or Sherman Act § 2 forbidding "monopolization" and "attempts to monopolize," *id.* § 2. The district court, 582 F.Supp. 734 (D.Mass.1984) held that the practice constituted an unreasonable restraint of trade in violation of section 1. We conclude that the practice does not violate either section of the Sherman Act; and we reverse the district court.

As the district court noted, the relevant facts are "not ... generally ... disputed." Blue Shield provides health insurance for physician services while its sister, Blue Cross, insures against hospital costs. The consumers of Blue Shield insurance, at least those who buy "full service" prepaid medical benefits, can see any "participating doctor," *i.e.*, a doctor who has entered into a standard Participating Physician's Agreement with Blue Shield. (If a doctor has not signed the Agreement, Blue Shield will reimburse him only if he provides emergency or out-of-state services.) Under the standard agreement, a participating doctor promises to accept as payment in full an amount determined by Blue Shield's "usual and customary charge" method of compensation. The district court found that the method has evolved, through the use of various 'capping' devices, towards payment of a 'fixed fee,' determined by Blue Shield, for each particular type of service. Blue Shield pays this amount directly to the doctor; the patient pays nothing out of his own pocket and therefore receives no reimbursement.

---

[*] Of the U.S. Court of Appeals for the Federal Circuit, sitting by designation."

The district court also found that Blue Shield provides some form of health insurance to about 56 percent of the Massachusetts population. (About 45 percent has coverage carrying a 'balance billing' ban.) If one subtracts from the total population universe those Massachusetts residents who rely on government sponsored health care (*e.g.*, Medicare or Medicaid), then Blue Shield (and Blue Cross) provide insurance coverage for about 74 percent of the rest, namely those Massachusetts residents who *privately* insure against health costs. (About 23 percent of that group have coverage with commercial insurers; and about 4 percent subscribe to Health Maintenance Organizations.) Virtually all practicing doctors agree to take Blue Shield subscribers as patients and to participate in its fee plan. Blue Shield payments made under that plan account for about 13 to 14 percent of all "physician practice revenue."

The district court found that, because of the large number of subscribers, doctors are under "heavy economic pressure" to take them as patients and to agree to Blue Shield's system for charging the cost of their care. The court believed that the effect of this payment system, when combined with Blue Shield's size and buying power, was to produce an unreasonably rigid and unjustifiably low set of prices. In the court's view, the fact that doctors cannot charge Blue Shield subscribers more than the Blue Shield payment-schedule amounts interferes with the doctors' freedom to set higher prices for more expensive services and discourages them from developing and offering patients more expensive (and perhaps qualitatively better) services. For these and related reasons, the district court held that Blue Shield's ban on 'balance billing' unreasonably restrains trade, and thereby violates Sherman Act § 1. Blue Shield appeals from this holding. The plaintiff doctors cross-appeal from other rulings of the district court in Blue Shield's favor.

On these appeals, the parties raise a host of issues not directly related to the antitrust merits, including the claim that a recently enacted state law, Mass.St.1984,

ch. 192, § 1, renders the case moot by immunizing Blue Shield's "balance billing ban" from the reach of the antitrust laws. The 'mootness' issue, however, is not a simple one. And even if we accepted the mootness claim, the new statute may not immunize the defendants from treble-damage liability for past conduct. In view of these legal and practical problems, and the fact that this case has been pending in the federal courts for more than seven years, we believe it simpler and more appropriate to proceed directly to the antitrust merits, which, on our view of the case, are dispositive.

## I

■ We disagree with the district court because we do not believe that the facts that it found show an unreasonable restraint of trade. We can best explain our reasons by first discussing the basic antitrust issue in general terms, then turning to the specific, detailed arguments advanced by the parties, and finally noting several special reasons here that militate against a finding of liability.

## A

We disagree with the district court's finding of "restraint." To find an unlawful restraint, one would have to look at Blue Shield as if it were a 'third force,' intervening in the marketplace in a manner that prevents willing buyers and sellers from independently coming together to strike price/quality bargains. Antitrust law typically frowns upon behavior that impedes the striking of such independent bargains. The persuasive power of the district court's analysis disappears, however, once one looks at Blue Shield, not as an inhibitory 'third force,' but as itself the purchaser of the doctors' services. *See Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 214, 99 S.Ct. 1067, 1075, 59 L.Ed.2d 261 (1979) (direct reimbursement to participating pharmacies for subscribers' drugs "merely [an] arrangement[ ] for the purchase of goods and services by Blue

Shield"). Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold. Thus, the more closely Blue Shield's activities resemble, in essence, those of a purchaser, the less likely that they are unlawful.

Several circuits have held in antitrust cases that insurer activity closely analogous to that present here amounts to purchasing, albeit for the account of others. And, they have held that an insurer may lawfully engage in such buying of goods and services needed to make the insured whole. The Second Circuit has held lawful a Blue Shield plan requiring pharmacies to accept Blue Shield reimbursement as full payment for drugs they supply to Blue Shield subscribers. *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502 (2d Cir.1982). The Third Circuit has allowed a hospital cost insurer (Blue Cross) to reimburse hospitals directly (and apparently completely) for services to subscribers. *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). The Seventh Circuit has permitted auto insurance companies to furnish direct reimbursement to repair shops as payment for the repair services provided to policyholders. *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

At the same time, the facts before us are unlike those in cases where courts have forbidden an 'organization' to buy a good or service—cases in which the buyer was typically a 'sham' organization seeking only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price. *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 235, 68 S.Ct. 996, 1005, 92 L.Ed. 1328 (1948) (horizontal price-fixing by purchasers held *per se* illegal); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (same); *National Maca-*

*roni Manufacturers Association v. Federal Trade Commission*, 345 F.2d 421 (7th Cir.1965) (competitors in trade association fixing quantity of scarce component to be used in macaroni held *per se* illegal). No one here claims that Blue Shield is such a 'sham' organization or anything other than a legitimate, independent medical cost insurer. *But cf. Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir.1980) (Blue Shield found to be a combination, not of policyholders, but of *physicians* ), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

Once one accepts the fact that, from a commercial perspective, Blue Shield in essence 'buys' medical services for the account of others, the reasoning underlying the Second, Third, and Seventh Circuit views indicates that the ban on balance billing is permissible. To understand that reasoning, consider some highly simplified examples. Suppose a father buys toys for his son—toys the son picks out. Or suppose a landlord hires a painter to paint his tenant's apartment, to the tenant's specifications. Is it not obviously lawful for the father (the landlord) to make clear to the seller that the father (the landlord) is in charge and will pay the bill? Why can he not then forbid the seller to charge the child (the tenant) anything over and above what the father (the landlord) pays—at least if the seller wants the buyer's business? To bring the example closer to home, suppose that a large manufacturing company hires doctors to treat its employees. Can it not insist that its doctors not charge those employees an additional sum over and above what the company agrees to pay them to do the job? In each of these instances, to refuse to allow the condition would disable the buyer from holding the seller to the price of the contract. Yet, if it is lawful for the buyer to buy for the third party in the first place, how can it be unlawful to bargain for a price term that will stick?

Given this argument, it is not surprising the courts have unanimously upheld con-

tracts analogous in various degrees to the one at issue here—contracts in which those who directly provide goods or services to insureds have agreed to cap or forego completely additional charges to those insureds in return for direct payment by the insurer. In addition to *Medical Arts* and *Travelers, supra,* see *Royal Drug Co. v. Group Life and Health Ins. Co.,* 737 F.2d 1433 (5th Cir.1984) ($2 cap on balance billing for drugs); *Webster County Memorial Hospital, Inc. v. United Mine Workers,* 536 F.2d 419 (D.C.Cir.1976) (hospital agrees to ban on balance billing in exchange for direct payment by union trust fund); *Proctor v. State Farm Mutual Auto Insurance Co.,* 675 F.2d 308, 337 (D.C.Cir.1982) (auto repair shops agree to provide repairs at rate set by insurance company), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230 (N.D.Cal.1981), *aff'd per curiam,* 677 F.2d 47 (9th Cir.) (cap on balance billing by participating pharmacies), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Feldman v. Health Care Service Corp.,* 562 F.Supp. 941 (N.D.Ill.1982) (same); *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania,* 574 F.Supp. 457 (M.D.Pa.1983), *aff'd,* 745 F.2d 248 (3rd Cir.1984) (ban on balance billing for dental services); *Michigan State Podiatry Association v. Blue Cross and Blue Shield of Michigan,* 1982–2 Trade Cas. (CCH) ¶ 64,801 (E.D. Mich.1982); *Blue Cross and Blue Shield of Michigan, Inc. v. Michigan Association of Psychotherapy Clinics, Inc.,* 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D.Mich.1980); *Davidowitz v. San Diego County Dental Society,* 1983–1 Trade Cas. (CCH) ¶ 65,231 (S.D.Cal.1983). Scholarly commentators believe that these cases were correctly decided. *See, e.g.,* P. Areeda, *Antitrust Analysis* 530–31 (1981) ("[I]t is difficult to see what could make [such an] arrangement anticompetitive"). *See also* Comment, 75 Nw.U.L.Rev. 506 (1980).

Two arguments might be made in an effort to distinguish these cases. First, the doctors may claim that Blue Shield is not,

in essence, a buyer. Traditionally, doctors have opposed financial arrangements that involved the 'selling' of their services to anyone but the patient. *See* Comment, 63 Yale L.J. 938, 978–80 (1954). And medical associations in the past sometimes have argued that selling services to third parties or related 'corporate practice' might interfere with the absolute ethical obligation that a doctor owes to the patient. *Id.,* (citing, *e.g.,* AMA, Principles of Medical Ethics, ch. 3, art. 5, § 4). Medical associations have not, however, opposed reimbursement by third party insurers, such as Blue Shield, a fact that arguably suggests an important distinction between 'insurance reimbursement' and 'purchasing.'

In our view, however, any such distinction is irrelevant for antitrust purposes. The relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge. Those facts led other courts in similar circumstances to treat insurers as if they were 'buyers.' The same facts convince us that Blue Shield's activities here are *like* those of a buyer. Whether for ethical, medical, or related professional purposes Blue Shield is, or is not, considered a buyer is beside the point. We here consider only one specific argued application of the antitrust laws and we do not suggest how Blue Shield ought to be characterized in any other context.

Second, the doctors seek to distinguish these precedents by pointing to an important district court finding either not present or not discussed in depth in these other cases. The district court here found that Blue Shield is a buyer with significant 'market power'—*i.e.,* the power to force prices below the level that a freely competitive market would otherwise set. They argue that Blue Shield's 'market power' makes a significant difference. We do not agree.

At the outset, we note that Blue Shield disputes the existence of significant 'market power.' It points out that the district court relied heavily upon participation by 99 percent of all Massachusetts doctors in

Blue Shield's program, as "prov[ing] ... Blue Shield's economic power." But, Blue Shield says, this by itself proves little. Participating in Blue Shield's program does not stop doctors from taking other patients or from charging those other patients what they like. As long as Blue Shield's rates are even marginally remunerative, 99 percent of all doctors might sign up with Blue Shield if it had only ten policyholders or ten thousand instead of several million.

Blue Shield adds that the record does not prove the existence of the single harm most likely to accompany the existence of market power on the buying side of the market, namely lower seller output. *See* P. Areeda, *supra* at 343 n. 20; R. Posner, *Antitrust*, 5–14, 91–3 (1974). Indeed, here the district court found that the supply of doctors in Massachusetts has "increased steadily during the past decade." Blue Shield also claims that whatever power it possesses arises from its ability as an 'expert' to prevent doctors from charging unknowledgeable patients *more* than a free (and informed) market price. *See generally* Comment, 75 Nw.U.L.Rev., *supra.*

On the other hand, several doctors testified that low prices discouraged them from introducing new highly desirable medical techniques. And, they argue that fully informed patients would have wanted to pay more for those techniques had they been allowed to do so.

To resolve this argument about the existence of market power—an issue hotly debated by the expert economists who testified at trial—would force us to evaluate a record that the district court described as "two competing mountains of mostly meaningless papers." Rather than do so, we shall assume that Blue Shield possesses significant market power. We shall also assume, but purely for the sake of argument, that Blue Shield uses that power to obtain 'lower than competitive' prices.

We next ask whether Blue Shield's assumed market power makes a significant legal difference. As a matter of pure logic, to distinguish the examples previously mentioned one must accept at least one of the following three propositions: One must believe either (1) that the law forbids a buyer with market power to bargain for 'uncompetitive' or 'unreasonable' prices, or (2) that such a buyer cannot buy for the account of others, or (3) that there is some relevant difference between obtaining such price for oneself and obtaining that price for others for whom one can lawfully buy. In our view, each of these propositions is false, as a matter either of law or of logic.

First, the antitrust laws interfere with a firm's freedom to set even uncompetitive prices only in special circumstances, where, for example, a price is below incremental cost. Such a "predatory" price harms competitors, cannot be maintained, and is unlikely to provide consumer benefits. *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983). *Cf. United States v. Aluminum Co. of America*, 148 F.2d 416, 437–38 (2d Cir.1945) (vertically-integrated aluminum monopolist cannot both charge an unreasonably high price for ingots *and* set a fabricated product price too low for competing fabricators to survive). Ordinarily, however, even a monopolist is free to exploit whatever market power it may possess when that exploitation takes the form of charging uncompetitive prices. As Professor Areeda puts it, "Mere monopoly pricing is not a violation of the Sherman Act." P. Areeda, *Antitrust Law* § 710' (Supp.1982). The Second Circuit has recently held that "more than monopoly power is necessary to make the charging of a noncompetitive price unlawful." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). *Cf. Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

The reasons underlying this principle include a judicial reluctance to deprive the lawful monopolist (say a patent monopolist) of its lawful rewards, and a judicial recognition of the practical difficulties of determining what is a "reasonable," or "competitive," price. *See* 2 P. Areeda & D. Turner, *Antitrust Law* §§ 512–14 (1978); 3 *id.*

¶ 710; R. Bork, *The Antitrust Paradox,* 125–29 (1978). As the Supreme Court stated in a different context,

> The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow.... [W]e should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organizations and a choice between rival philosophies.

*United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927). Thus, where a monopoly is unlawful, antitrust courts typically seek to change the market's structure, "to break up or render impotent the monopoly power which violates the Act." *United States v. Aluminum Co. of America,* 91 F.Supp. 333, 334 (S.D.N.Y.1950) (citing *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 128–29, 68 S.Ct. 947, 957, 92 L.Ed. 1245 (1948)). *See also Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Courts only rarely try to supervise the price bargain directly. 3 P. Areeda & D. Turner, *supra,* ¶ 710 n. 2. *Cf. United States v. Glaxo Group Ltd.,* 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973) (ordering compulsory patent licensing "at reasonable charges"). And, where monopoly power is regulated, the regulator, not the court, bears the burden of determining whether prices are reasonable. *See, e.g.,* Mass.Gen.Laws ch. 164, §§ 93–94 (state regulation of gas and electric rates).

The district court did not suggest here that the prices subject to the 'balance billing' ban were 'predatory.' Nor (with one possible exception, see pp. 932–933) do the parties point to evidence of any price below anyone's 'incremental cost.' *Cf. Barry Wright Corp. v. ITT Grinnell Corp., supra.* Rather, the district court suggested that Blue Shield's prices were 'uncompetitively low,' 'unreasonably low,'

lower than the doctors might have charged to individual patients lacking market power. That is to say, Blue Shield obtained prices that reflected its market power. For the reasons just mentioned then, if Blue Shield had simply purchased those services for itself, the prices paid, in and of themselves, would not have amounted to a violation of the antitrust laws. *Berkey Photo, Inc. v. Eastman Kodak Co., supra;* 3 P. Areeda & D. Turner, *supra,* ¶ 710.

Second, as we previously mentioned, there is no law forbidding a legitimate insurance company from itself buying the goods or services needed to make its customer whole. The cases that we have cited are unanimous in allowing such arrangements. The rising costs of medical care, the possibility that patients cannot readily evaluate (as competitive buyers) competing offers of medical service, the desirability of lowering insurance costs and premiums, the availability of state regulation to prevent abuse—all convince us that we ought not create new potentially far-reaching law on the subject. And, the parties have not seriously argued to the contrary.

Third, to reject the first two propositions is, as a matter of logic, to reject the third. If it is lawful for a monopoly buyer to buy for the account of another, how can it be unlawful for him to insist that no additional charge be made to that other? To hold to the contrary is, in practice, to deny the buyer the right to buy for others, for the seller would then be free to obtain a different price from those others by threatening to withhold the service. This reasoning seems sound whether or not the buyer has 'market power.'

In essence, then, the lawfulness of the term in question stems from the fact that it is an essential part of the price bargain between buyer and seller. Whether or not that price bargain is, in fact, reasonable is, legally speaking, beside the point, even in the case of a monopolist. As Blue Shield stresses in its brief, health maintenance organizations, independent practice associations, and preferred provider organizations

all routinely agree with doctors that the doctors will accept payment from the plan as payment in full for services rendered to subscribers. We can find no relevant analytical distinction between this type of purchasing decision and the practice before us—even on the assumption that Blue Shield possesses market power.

## B

We now consider more closely the specific arguments raised by the district court and the parties to show that Blue Shield's 'balance billing ban' is anticompetitive in practice. The Rodkey plaintiffs' brief sets forth in summary form the following allegedly harmful effects of the ban:

(1) Price competition among physicians for services covered by Blue Shield's service benefit policies is "virtually eliminated."

(2) Doctor's prices have tended to cluster around Blue Shield's "maximum price levels."

(3) Doctors wanting to compete by offering innovative or 'premium' services are inhibited from doing so because Blue Shield's pricing structure assumes that physicians' services are fungible and mandates the same price ceilings for virtually all physicians.

(4) Doctors just entering practice are discouraged from doing so by particularly low levels of Blue Shield reimbursement.

(5) Blue Shield's low prices lead doctors to charge higher prices to others.

(6) Blue Shield discourages doctors from charging others low prices by insisting that its subscribers be given the benefit of any such low prices.

(7) Blue Shield's pricing system discourages doctors from trying out more expensive services that could bring about lower total medical costs, e.g., a "colonoscopy with polypectomy," an expensive service that is nonetheless cheaper than the surgery that would otherwise be needed to cure the patient.

(8) Blue Shield, by reason of its pricing practices, has been able to attract more subscribers, extending its "competitive edge" over other health insurers, and increasing its dominance in the health insurance business.

The first seven of these arguments attack the price term in the agreement between Blue Shield and the doctors. To argue that Blue Shield's pricing system is insufficiently sensitive to service differences, or that it encourages high costs, or does not give the patients what they really need, or to claim that the buyer is making a bad decision is like arguing that the buyer of a fleet of taxicabs ought to buy several different models, or allow the seller to vary color or horsepower or gearshift because doing so either will better satisfy those passengers who use the fleet's services, or will in the long run encourage quality and innovation in automobile manufacture. The short—and conclusive—answer to these arguments is that normally the choice of what to seek to buy and what to offer to pay is the buyer's. And, even if the buyer has monopoly power, an antitrust court (which might, in appropriate circumstances, restructure the market) will not interfere with a buyer's (nonpredatory) determination of price.

■ Thus, the arguments that Blue Shield's payments for doctors' services are "too low" are disposed of by our discussion at pp. 927–928, *supra.* A legitimate buyer is entitled to use its market power to keep prices down. The claim that Blue Shield's price scheme is "too rigid" because it ignores qualitative differences among physicians is properly addressed to Blue Shield or to a regulator, not to a court. There is no suggestion that Blue Shield's fee schedule reflects, for example, an effort by, say, one group of doctors to stop other doctors from competing with them. *Cf. Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, supra.* Here, Blue Shield and the doctors "sit on opposite sides of the bargaining table," *Royal Drug Co. v. Group Life & Health Insurance Co.,* 737 F.2d at 1438. And Blue Shield seems simply to be acting

"as every rational enterprise does, *i.e.,* [to] get the best deal possible," *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d at 84. The first seven adverse consequences to which appellees point are the result of this unilateral behavior.

Plaintiffs' eighth argument focuses on the health insurance business: Blue Shield's 'ban on balance billing,' by attracting more subscribers, augments its share of the health insurance business, thereby enabling it to secure still lower doctor charges. This argument, however, comes down to saying that Blue Shield can attract more subscribers because it can charge them less. If Blue Shield is free to insist upon a lower doctor charge, it should be free to pass those savings along to its subscribers in the form of lower prices. This conclusion does not rest upon a judgment about the reasonableness of the doctor charge. A monopolist who charges his customers a high price is free to pay his suppliers more, thereby attracting higher quality raw materials. Considered in and of itself, higher quality, like lower price, is good—even if it helps the monopolist maintain his market power through "superior skill, foresight and industry." *See United States v. Aluminum Co. of America,* 148 F.2d at 429.

Finally, the district court rested its decision in large part upon the Supreme Court's recent case, *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). *Maricopa,* however, involved a *horizontal* agreement among competing doctors about what to charge. A horizontal agreement among competitors is typically unlawful because the competitors prevent themselves from making *independent* decisions about the terms as to which they will bargain. Competitors cannot *agree,* for example, to insist that their contracts with sellers contain arbitration clauses, even though each individual competitor can make up his own mind to insist upon such a term in any, or all, of his contracts. *United States v. First National Pictures, Inc.,* 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930); *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930). The unlawfulness of the agreement does not necessarily depend upon the undesirability of the contractual term as to which competitors agree not to compete.

The district court saw a similarity between the horizontal agreement cases and this one in the fact that Blue Shield can extract an "uncompetitive price" from doctors while the *Maricopa* court feared that "price-fixing" by competitors might bring about uncompetitive prices. But, the antitrust problems at issue when a single firm sets a price—whether, when, and how courts can identify and control an individual exercise of alleged market power—are very different from those associated with agreements by competitors to limit independent decision-making. A decision about the latter is not strong precedent for a case involving only the former. *Maricopa* is simply not on point. Nor, for similar reasons, is *National Collegiate Athletic Association v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), another "horizontal agreement" case cited by the doctors.

## C

Three additional circumstances militate strongly here against any effort by an antitrust court to supervise the Blue Shield/physician price bargain. These three considerations convince us to apply mainstream antitrust doctrine, which allows a buyer or seller freedom to bargain for price, rather than to seek analogies with more unusual cases that do not.

First, the prices at issue here are low prices, not high prices. *See* Comment, 75 Nw.L.Rev. at 522–23. Of course, a buyer, as well as a seller, can possess significant market power; and courts have held that *agreements* to fix prices—whether maximum or minimum—are unlawful. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998

(1968). Nonetheless, the Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high*, not too low. *See* R. Bork, *supra*, at 61–2. And, the relevant economic considerations may be very different when low prices, rather than high prices, are at issue. These facts suggest that courts at least should be cautious—reluctant to condemn too speedily—an arrangement that, on its face, appears to bring low price benefits to the consumer. *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d at 231–34.

Second, the subject matter of the present agreement—medical costs—is an area of great complexity where more than solely economic values are at stake. How to provide affordable, high quality medical care is much debated. And, many different solutions—ranging from stricter regulation to greater reliance on competing service organizations—have been proposed. *See* Clark, "Why Does Health Care Regulation Fail?" 41 Md.L.Rev. 1 (1981); A. Enthovin, *Health Plan* (1980). This fact, too, warrants judicial hesitancy to interfere.

Third, the price system here at issue is one supervised by state regulators. See *Kartell v. Blue Shield of Massachusetts, Inc.*, 384 Mass. 409, 422, 425 N.E.2d 313 (1981). While that fact does not automatically carry with it antitrust immunity, *see Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), it suggests that strict antitrust scrutiny is less likely to be necessary to prevent the unwarranted exercise of monopoly power. Of course, administrative regulation is a highly imperfect process. But, regulation by judicial decree is not necessarily preferable.

■ These general considerations do not dictate our result in this case. They do, however, counsel us against departing from present law or extending it to authorize increased judicial supervision of the buyer/seller price bargain. Like the court in *Feldman v. Health Care Corp.*, we see "no need to blaze new trails," 562 F.Supp. at 946. Without such pioneering, we do not

believe the antitrust laws forbid Blue Shield's 'balance billing' practice. Contrary to the district court's conclusion, the practice does not constitute an unreasonable restraint of trade. And, the same reasons that lead us to this conclusion also lead us to agree with the district court that the practice does not constitute monopolization or an attempt to monopolize. *See* 3 P. Areeda & D. Turner, *supra*, ¶ 626 at 83.

### III

We turn now to four issues that the plaintiff doctors raise in their cross-appeal from other rulings of the district court—rulings that dismissed various parts of their case against Blue Shield (and against Blue Cross, Blue Shield's sister organization). The fact that we have found Blue Shield's ban on balance billing to be lawful simplifies the issues on the cross-appeal and virtually determines an outcome in defendants' favor.

■ First, the doctors argue that the district court wrongly dismissed their claim that Blue Shield's refusal to reimburse nonparticipating doctors (except for emergency or out-of-state services) violated the antitrust law. The district court found that Blue Shield's actions were immunized from antitrust attack by a prong of the "state action" doctrine which removes actions required (or forbidden) by state laws from the scope of the federal antitrust laws. *See Hoover v. Ronwin*, —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). The Massachusetts Supreme Judicial Court has held that state law, namely Mass.Gen.Laws ch. 176B, § 7 prohibits Blue Shield from generally reimbursing nonparticipating doctors, *Kartell v. Blue Shield of Massachusetts, Inc.*, 384 Mass. 409, 423, 425 N.E.2d 313, 321 (1981).

The doctors here argue that Massachusetts state law cannot immunize Blue Shield's conduct because the relevant Massachusetts state law is preempted by federal pension law—the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1381—and it is therefore without legal effect. We need not trace

the labyrinthine path of this preemption argument, however, for we uphold the district court's ruling for a simpler reason. Since there is no relevant factual dispute, we have examined the legal merits of the doctors' substantive antitrust claim. We conclude that the facts to which they point do not make out a violation of the antitrust laws. No trier of fact, whether judge or jury, could properly find in their favor.

The doctors charge that Blue Shield simply refuses to deal with doctors who do not agree to participate in its program. The doctors strongly argued that this 'refusal to deal' helped Blue Shield implement its ban on balance billing. Were that ban unlawful, the 'refusal to deal' conceivably could have been found unlawful, too, as an unjustified means towards that unlawful end. If the ban is lawful, however, the 'refusal to deal' charge must rise, or fall, on its own. And, on its own, it runs squarely into basic antitrust law that a firm "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite*, —— U.S. at ——, 104 S.Ct. at 1469; *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). There is nothing special here to take this case outside the general rule. There is neither evidence of a horizontal conspiracy nor any charge that Blue Shield agreed with one of its competitors not to deal with nonparticipating doctors. *Cf. Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (horizontal agreement to boycott certain customers held illegal). Any participation by Blue Cross in Blue Shield's decision is beside the point, for Blue Cross (a hospital cost insurer) does not compete with Blue Shield, nor does it maintain any relevant balance billing ban on its own. Thus, its (alleged) participation does not compromise in any relevant way the *independence* of Blue Shield's dealing decisions (any more than, say, a hypothetical Blue Shield meeting with a business consultant). *Cf. Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, ——, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984). In a nutshell, Blue Shield's independent determination of the terms on which it will deal, of the customers to whom it will sell, and of the suppliers from whom it will purchase is a manifestation of the competitive process, not an effort to suppress or to destroy that process. *Cf. Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918) ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.").

■ Second, the doctors charge that Blue Shield engaged in "predatory" pricing behavior. And, they point to one instance, allegedly supported by the record, when Blue Shield charged a lower price for insurance than a competitor (a firm called GISC), and it later turned out that Blue Shield lost money on the policies. The district court held that the injury suffered as a result of any such predatory conduct, occurred only in the market for insurance; and the doctors did not have a sufficiently direct interest in competitive injuries in that market to give them 'standing' to complain of anticompetitive activity there.

On this appeal, the doctors challenge the court's ruling denying them standing to assert this Sherman Act § 2 claim. Like their first challenge, their argument would be far stronger had they prevailed on the 'balance billing' claim. Then, one might have accepted their claim that this single instance of "predatory pricing" was part and parcel of a bundle of anticompetitive activities designed to give Blue Shield significant market power in the medical insurance business. *See* Plaintiffs' First Amended Complaint, ¶ 18. And, anticompetitive activities that significantly lessen competition in that business can harm not only other insurance firms, 2 P. Areeda & D. Turner, *supra* ¶ 340a, but also customers of insurance firms, *id.* ¶ 337, and suppliers of insurance firms (such as doctors), *id.* ¶¶ 338–39. These harms, plaintiffs assert, were great enough, and direct

enough, to confer on suppliers (such as doctors) standing to complain of the anticompetitive conduct in a lawsuit and to seek equitable relief.

Once the 'balance billing' claim is eliminated, however, the doctors' argument lacks plausibility. They can no longer argue that insurance prices that reflect Blue Shield's 'balance billing' rule are automatically unlawful. The "predatory pricing" charge must stand on its own, and to succeed it requires a showing that the price was below "incremental cost" (or the equivalent). *See Barry Wright Corp. v. ITT Grinnell Corp., supra.* The only evidence to which the doctors can now point is the single, isolated instance in respect to GISC. GISC accounted for less than 0.1 percent of the health insurance market. Thus, even if the "predatory pricing" charge is true in respect to GISC, there is no evidence that the charged conduct could lead to any significant increase in Blue Shield's market power. Under these circumstances the possibility of injury to a supplier is simply too remote and indirect to allow a supplier to bring suit. Were the suit one for treble damages, the supplier's injury would be far too indirect to confer standing, *see Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (standing to assert treble-damages claim under § 4 of Clayton Act denied where plaintiff's injury was "indirect" and chain of causation tenuous). Although standing rules for an injunctive action under § 16 of the Clayton Act are more liberal, plaintiffs still must show that the charged conduct threatens them with harm. *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 260–62, 92 S.Ct. 885, 890–91, 31 L.Ed.2d 184 (1972); 2 P. Areeda & D. Turner, *supra,* ¶¶ 328a, 335e. Plaintiffs cannot show this in respect to the GISC type of conduct. Thus, without the support of a 'balance billing' claim, the doctors cannot obtain a reversal of the district court's ruling that they lacked standing to complain of "predatory pricing."

Third, the doctors attack the district court's dismissal of their claims against Blue Cross. Massachusetts state law expressly authorizes Blue Cross and Blue Shield to contract with each other "for the joint administration of their business and for joint and co-operative writing and issuing of certificates." Mass.Gen.Laws ch. 176A, § 5; *see also id.,* ch. 176B, § 3. The district court therefore found that the "state action" doctrine and the McCarran-Ferguson antitrust exemption for the "business of insurance," 15 U.S.C. §§ 1011 *et seq.,* immunized Blue Cross's challenged conduct from antitrust scrutiny. Again, we need not accept the doctors' invitation to enter the legal thickets that surround these doctrines, for, with the demise of their 'balance billing' claim, the doctors are no longer able to make any plausible charge of a substantive antitrust violation. Once the ban on 'balance billing' is seen as permissible, the doctors' allegation against Blue Cross amounts to a claim that it conspired or agreed with Blue Shield to achieve a *lawful* objective, not an unlawful one. Blue Cross, concededly, is not a competitor of Blue Shield. There is no claim that the fact of agreement, in and of itself, inhibits any otherwise independently competitive action. *Cf. Fashion Originators' Guild of America v. Federal Trade Commission, supra.* Under these circumstances, the agreements violate no principle of antitrust law of which we are aware. Even were the agreements subject to substantive antitrust scrutiny, the doctors have failed to show us anything about them that would allow a finding of unlawfulness.

Fourth, and finally, the doctors assert that Blue Shield "has engaged in coercive attacks designed to intimidate and retaliate against physicians"—evidently those who oppose the ban on balance billing. As far as we can tell from the briefs, however, the activities that the doctors allege do not make out independent violations of the antitrust laws, once one accepts the fact that Blue Shield's balance billing rule is lawful. Even viewed in a light most generous to plaintiffs, the conduct they complain of at most might amount to minor business

torts, which lie beyond the purview of the antitrust laws, *see* 3 P. Areeda & D. Turner, *supra* ¶ 626d.

*For these reasons, the district court's finding that the ban on balance billing is unlawful is reversed, and the district court's injunction is vacated. In all other respects the order of the district court is affirmed.*