WESTCHESTER RADIOLOGICAL
ASSOCIATES, P.C., et al.,
Plaintiffs,

v.

EMPIRE BLUE CROSS AND BLUE
SHIELD, INC., Defendant.

No. 85 Civ. 2733 (SWK).

United States District Court,
S.D. New York.

April 23, 1987.

Garfunkel, Wild & Travis, P.C., Great Neck, N.Y. by Norton L. Travis, Kramer, Levin, Nessen, Kamin & Frankel, New York City by Daniel P. Levitt, Michael B. Reuben, for plaintiffs.

Breed, Abbott & Morgan, New York City by Robert A. Bicks, Alan C. Drewsen, P. Kent Correll, for defendant.

MEMORANDUM OPINION
AND ORDER

KRAM, District Judge.

This is an action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Donnelly Act, N.Y.Gen.Bus.Corp.Law

§ 340. Plaintiffs allege unlawful restraint of trade, monopolization, and price fixing in violation of the federal antitrust laws as well as New York State law. Plaintiffs seek injunctive and treble damage relief. The case is presently before the Court on defendant's motion to dismiss the complaint, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, on the grounds: (1) that plaintiffs' claim under Section 1 of the Sherman Act fails to state a claim under the antitrust laws upon which relief can be granted; (2) that plaintiffs lack standing to maintain an action based on their claims under Section 2 of the Sherman Act; and (3) that, as a result, this Court lacks jurisdiction to consider plaintiffs' pendent state law claim. For the reasons set forth below, defendant's motion is denied.

## FACTS

The basic facts are not in dispute. Plaintiffs are a majority of the hospital-based radiologists (the "Radiologists") who work in the seventeen counties in and around New York City ("Downstate New York"). Defendant Empire Blue Cross and Blue Shield, Inc. ("Empire") is a non-profit health insurance corporation organized and existing under Article 43 of the New York Insurance Law. Empire is the product of a merger of Blue Cross/Blue Shield of Greater New York, Inc., which served Downstate New York, and Blue Cross of Northeastern New York, Inc., which served the Northeastern New York area.

Empire offers two basic insurance plans: (1) "Blue Cross," which covers certain defined hospital benefits, and (2) "Blue Shield," which covers professional medical services provided by physicians. Empire provides Blue Cross hospital service benefit coverage to more than 9 million covered persons. In order to provide inpatient hospital services under these subscriber contracts, Empire has contracts with hospitals whereby the hospitals accept state regulated payments from Empire as full reimbursement for such services and may not seek to collect additional charges from Empire's subscribers. Empire does not pay on the basis of the particular hospital services that may be rendered to a particular patient; instead, Empire makes a "per diem" payment calculated on the basis of the hospital's overall expenses as incurred in a previous "base" year.

Empire's Blue Shield plan, on the other hand, covers bills for physicians' services actually rendered to a patient, whether in the hospital, the examining room or the home. "Participating" physicians send their bills to Empire, and Empire pays the physician an agreed-upon amount for the services rendered. "Non-participating" physicians send their bills directly to a subscriber, who, in turn, is reimbursed by Empire in the same amount it would have paid had the physician been a participant. Subscribers are then left to pay any difference in cost. In either case, the physician bills for specific services as performed, and the size of his fee depends on the nature of those services.

Radiologists are licensed physicians who have completed special residency programs in radiology [1] and have thereby become qualified in that particular medical specialty. The Radiologists, pursuant to agreements which they have maintained with various hospitals in Downstate New York, practice on hospital premises, as opposed to in private offices.

In general, health insurance plans allow hospital-based radiologists to direct-bill their patients—or their patients' medical insurance carriers—for diagnostic—but not technical—radiological services actually rendered by a radiologist in a hospital. In Downstate New York, however, the hospital-based Radiologists receive compensation for their services directly from the hospitals. Such compensation is included as a cost in the computation of the Blue Shield per diem reimbursement rate paid by Empire to these hospitals.

---

1. The Second Amended Complaint defines "radiology" as "the medical specialty concerned with the diagnostic and therapeutic use of x-rays, radium rays and other forms of radiant energy or its equivalent, in the diagnosis and treatment of disease or injury."

According to the Radiologists' complaint, Empire alone insists that both the technical component and the professional component of radiological services provided to Blue Cross subscribers be treated as a covered hospital service under its Blue Cross plan, and, as a result, the Radiologists are compelled to accept reimbursement from the hospitals for services provided subscribers at levels substantially lower than would have prevailed in the absence of Empire's unlawful acts and in freely competitive conditions. In other words, if Empire would agree to let radiologists bill directly for the professional/diagnostic component of their services—as all other physicians allegedly are allowed to do—they could make more money. Indeed, the Radiologists specifically claim that the clear and intended effect of Empire's policy [2] is to reduce hospital-based radiologists' income in Downstate New York by some $25 million per year so as to preserve the attractiveness of its Blue Cross coverage as against its hospital insurance competitors and avoid saddling the Blue Cross plan with the need to raise its premiums and lose business to its competitors.

As a result, the Radiologists allege (1) that Empire has, in combination and concert with the hospitals in Downstate New York, fixed prices and otherwise restrained the manner in which the Radiologists bill for their time in violation of Section One of the Sherman Act, (2) that injury to the Radiologists is the precisely intended consequence of, and is inextricably intertwined with Empire's attempted monopolization of the hospital insurance market and its leveraging of that monopoly into an anticompetitive advantage in the medical insurance market in violation of Section 2 of the Sherman Act, and (3) that, as a result, Empire also has violated New York State antitrust law.

## DISCUSSION

Empire, accepting the factual allegations in the complaint as true for the purposes of its motion, moves to dismiss on three grounds. First, Empire argues that the complaint fails to state an antitrust claim because Empire's contracts with the hospitals are merely arrangements for the purchase of goods and services by Empire and antitrust law usually permits a legitimate buyer to use its market power to keep prices down. Second, Empire contends that, because the Radiologists are neither consumers nor competitors in the relevant market, they lack standing to pursue an action for abuse of monopoly power in that market. Third, Empire argues that jurisdiction over the New York State Donnelly Act claim is pendent to the federal antitrust claims and must fail for want of federal jurisdiction once the Radiologists' federal claims have been dismissed.

*The Section One Claim*

Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combi-

---

2. Empire explains that:

In 1969, however, the New York Legislature became convinced that retrospective reimbursement failed to encourage the hospitals to control their costs, which were increasing at an alarming rate. As a result, the Legislature revised Chapter 28 of the Public Health Law, which set forth the procedure for determining hospital reimbursement, and directed the Commissioner of Health to develop an "effective cost control program" that would "both enable and motivate hospitals to control their spiraling costs" (Chapter 957, 1969 N.Y. laws). Given this mandate, the Commissioner developed regulations, now codified as NYCRR § 86–1.1, *et seq.* (the "Regulations" or "Part 86"), that established the system of "prospective" reimbursement that remains in use in New York State.

Instead of paying the hospital for the charges for all items of care rendered to each individ-

ual patient, under a prospective methodology Blue Cross pays a set amount to the hospital for each "patient day" of care rendered to a person with Blue Cross hospital coverage. That amount, referred to as the *"per diem* reimbursement rate" in paragraph 12 of the Complaint, is established annually for each Downstate Hospital on the basis of financial data it supplies and is provided to each hospital in advance of the rate year so that each may have an opportunity to plan its budget accordingly. If, during the rate year, a hospital's cost of providing care is less than the *per diem,* the hospital retains the difference. If the cost of care is greater than the payment rate, the hospital absorbs the difference. Thus, prospective reimbursement gives the hospitals an incentive to reduce waste and to make their own operations more efficient.

nation in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1. In relation to the health insurance field, the weight of authority holds that a contract that sets the price for services between a buyer—such as Empire—and a seller—such as a hospital, a physician, a psychotherapist or a pharmacy—is neither per se illegal nor an unreasonable restraint of trade under Section 1. *E.g., Brillhart v. Mutual Medical Insurance, Inc.,* 768 F.2d 196 (7th Cir.1985); *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Royal Drug Co. v. Group Life & Health Insurance Co.,* 737 F.2d 1433 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau,* 701 F.2d 1276 (9th Cir.1983), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 675 F.2d 502 (2d Cir.1982) (per curiam); *Webster County Memorial Hospital, Inc., v. United Mine Workers of America Welfare & Retirement Fund of 1950,* 536 F.2d 419 (D.C.Cir. 1976) (per curiam); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 603 F.Supp. 1077 (S.D.Ind.1985), *aff'd,* 784 F.2d 1325 (7th Cir.1986); *Sausalito Pharmacy, Inc. v. Blue Shield,* 544 F.Supp. 230, *aff'd per curiam,* 677 F.2d 47 (9th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Michigan State Podiatry Association v. Blue Cross and Blue Shield of Michigan,* 1982–2 Trade Cas. (CCH) ¶ 64,801 (E.D.Mich.1982); *Blue Cross and Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics,* 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D.Mich.1980).

Relying on the *Kartell* line of cases, Empire argues that the Radiologists' Section One claim should be dismissed on the grounds that:

In essence, then, the lawfulness of the term in question stems from the fact that it is an essential part of the price bargain between the buyer and seller. Whether or not that price bargain is, in fact, reasonable is, legally speaking, beside the point, even in the case of a monopolist. As Blue Shield stresses in its brief, health maintenance organizations, independent practice associations and preferred provider organizations all routinely agree with doctors that the doctors will accept payment in full for services rendered to subscribers. We can find no relevant analytical distinction between this type of purchasing decision and the practice before us—even on the assumption that Blue Shield possesses market power.

*Kartell,* 749 F.2d at 928–29. As a result, Empire contends that it can legally hold to its longstanding arrangements with the hospitals to the effect that radiological services for persons it covers are the responsibility of the hospitals to provide and purchase.

■ The Radiologists, however, rightly contend that the *Kartell* line of cases, which stands for the proposition that buyers and sellers may negotiate about the terms of purchase without violating the antitrust laws, is inapposite here where the buyer (Empire) has no contractual relations with the sellers (the Radiologists) and has not negotiated for any. Rather, the crucial agreement here, whereby Empire allegedly compels the hospitals to prevent the direct billing of Blue Cross subscribers for the Radiologists' diagnostic services, is between Empire and the hospitals, *not* Empire and the Radiologists. This triangular relation—with Empire intervening as a third force—is expressly excluded from the holding in the *Kartell* line of cases:

To find an unlawful restraint, one would have to look at [Empire] as if it were a "third force," intervening in the marketplace in a manner that prevents willing buyers and sellers from independently coming together to strike price/quality bargains.

*Kartell,* 749 F.2d at 924.

In other words, although buyers may permissibly bargain with sellers, if the in-

surance plan in *Kartell* had not dealt bilaterally with the physician-sellers of medical services but instead had acted as an inhibitory "third force" interfering in a separate buyer/seller relationship involving other persons, the relationship would not have been exempt from antitrust scrutiny. That, of course, is precisely the present case; Empire here is charged with intervening in the relationship between the Radiologists and the hospitals so as to prevent hospital-based radiologists from direct billing their patients for professional medical services.

Accordingly, Empire's motion to dismiss the Radiologists' Section One claim on the ground that the Kartell line of cases is dispositive of that claim is denied.

*The Section Two Claims*

With respect to claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, courts have grafted a doctrine of standing onto the sweeping language of Section 4 of the Clayton Act, 15 U.S.C. § 15. *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 554 F.Supp. 838, 842 (S.D.N.Y. 1982), *aff'd*, 724 F.2d 290 (1983). Section 4 of the Clayton Act permits "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to sue for treble damages recovery in federal district court. 15 U.S.C. § 15.

The Supreme Court most recently addressed questions of antitrust standing in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), and *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In *McCready*, the Supreme Court acknowledged two types of limitations on the availability of the Section 4 remedy to particular classes of persons and for redress of particular forms of injury: (1) limitations designed to prevent double recovery, and (2) limitations where the injuries are "too remote" from the antitrust violation to afford standing. *McCready*, 457 U.S. at 472–78, 102 S.Ct. at 2544–47. In *Associated General*, the Supreme Court found certain oth-

er factors also to be relevant to the question of antitrust standing: (1) whether the alleged injury resulted from anticompetitive activity, i.e., was of the type sought to be prevented by the antitrust laws, (2) whether the asserted injury was direct or indirect, (3) whether there existed an alternative plaintiff "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," (4) whether the nature of the damages was speculative, and (5) whether there was danger of double recovery. *Associated General*, 459 U.S. at 535–44, 103 S.Ct. at 907–11. *See also Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1432 (S.D.N.Y.1986); *Rosenberg v. Gottlieb, Steen & Hamilton*, 598 F.Supp. 642, 644–45 (S.D.N.Y.1984).

*Associated General* also advises federal courts to abstain from black letter rules and to analyze the facts in each case. *Id.*, 459 U.S. at 536 n. 33, 103 S.Ct. at 907 n. 33; *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983). In light of this admonition, the Second Circuit, which previously had followed the "target area" approach to such determinations, provided that:

> While we do not hold that *Calderone [Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292 (2d Cir.1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972),] and *Billy Baxter [, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2nd Cir.1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971),] have been drained of their precedential vitality on their own or very similar facts, we think that in approaching new problems, courts of this circuit would do better, indeed are compelled, to follow the approaches adumbrated by the Supreme Court in *McCready* and *Associated General* without concern whether the results are consistent with language in earlier Second Circuit cases.

*Crimpers Promotions*, 724 F.2d at 293.

Empire contends here that the Radiologists monopoly claims under Section 2 must be dismissed as the Radiologists lack standing to challenge Empire's alleged monopoli-

zation of the hospital insurance market and its monopoly leveraging of the medical insurance market. Specifically, Empire argues that the Radiologists are neither consumers nor competitors in the hospital insurance market and that there is an identifiable class of persons—namely the private competing health insurance companies—whose self-interest normally would motivate them to vindicate the public interest and bring such an action. As a result, Empire contends that, pursuant to *Associated General*, the Radiologists lack standing to commence this antitrust action.

Empire's arguments are unavailing. An antitrust plaintiff need not be either a competitor or a consumer in the relevant market in order to have antitrust standing. *McCready*, 457 U.S. at 483–84 & n. 21, 102 S.Ct. at 2250–51 & n. 21; *Crimpers Promotions*, 724 F.2d at 296 n. 6. Furthermore, the Court has analyzed the *McCready* limitations and the *Associated General* factors relative to this case and determines that the Radiologists do indeed have standing to pursue their Section 2 claims.

There is no potential here for double recovery by the Radiologists as their losses are readily separable from any competitive disadvantage suffered by another insurer. Nor are their alleged injuries too remote from the alleged antitrust violations to afford standing; indeed, their alleged injuries are the "precisely intended consequence" of Empire's alleged antitrust violations and are "inextricably intertwined" with the advantages Empire allegedly seeks to gain against its competitors. *Crimpers Promotions*, 724 F.2d at 294–95. As a result, the *McCready* limitations are not a bar to standing here.

The Radiologists also succeed under the factors enunciated in *Associated General*. First, the alleged injury results from Empire's alleged anticompetitive conduct. Second, the Radiologists alleged injury is directly related to Empire's alleged anticompetitive benefit and is specifically directed against the Radiologists. Third, because the Radiologists allegedly are the targets of Empire's conduct, they are the logical plaintiffs to bring this action. In addition, the impact of Empire's alleged conduct on the competing insurers, which are other potential plaintiffs identified by Empire, may indeed not be sufficiently injurious to the competing insurers for them to undertake the time and expense of litigation. Fourth, the Radiologists' damages appear readily calculable in that the Radiologists' records will reflect what services they performed for Blue Cross subscribers and what the comparable billings for those services should have been based on direct billings under other health insurance policies. Fifth, there is no risk of duplicate recovery.

In sum, the Radiologists satisfy the antitrust standing requirements of both *McCready* and *Associated General*, and are clearly appropriate plaintiffs in this antitrust action. Accordingly, Empire's motion to dismiss the Radiologists' Section 2 claims for lack of standing is denied.

*The Donnelly Act Claim*

Jurisdiction over Donnelly Act claims is pendent to, and thus derives from, the federal antitrust claims. Because Empire's motion to dismiss the federal claims is denied, the Court also maintains federal jurisdiction over the Radiologists' Donnelly Act claim.

## CONCLUSIONS

Accordingly, for the reasons outlined above, Empire's motion to dismiss the complaint pursuant to Rule 12(b) of the federal Rules of Civil Procedure is denied in its entirety.

SO ORDERED.