WESTCHESTER RADIOLOGICAL
ASSOCIATES P.C., et al.,
Plaintiffs,

v.

EMPIRE BLUE CROSS AND BLUE
SHIELD, INC. Defendant.

No. 85 CIV. 2733 (KMW).

United States District Court,
S.D. New York.

Feb. 24, 1989.

Daniel P. Levitt, Reid & Priest, New
York City, Norton B. Travis, Garfunkel,
Wild & Travis, Great Neck, N.Y., for plain-
tiffs.

Robert A. Bicks, Howard S. Wolfson,
Breed, Abbott & Morgan, New York City,
for defendant.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiffs allege unlawful restraint of
trade, monopolization, and price fixing in
violation of the federal antitrust laws and
New York State law. 15 U.S.C. §§ 1, 2;
N.Y.Gen.Bus.Corp.Law § 340. Plaintiffs
seek treble damages and injunctive relief.
The case is presently before the Court on
defendant's motion for summary judgment
on the grounds that (1) defendant's alleged
conduct does not violate Sections 1 and 2 of
the Sherman Act; (2) plaintiffs' claims are
barred by the McCarran–Ferguson Act;
and (3) plaintiffs' claims are barred by the

state action doctrine. Plaintiffs cross-move for partial summary judgment to strike the McCarran–Ferguson and state action defenses.

In proceedings before the judge to whom this action was originally assigned, defendant moved to dismiss the complaint. Although the Court believes that defendant's prior motion should have been granted, the Court has considered all the affidavits, exhibits, and legal memoranda submitted by the parties. After a thorough review of the record, the Court finds that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law. Accordingly, defendant's motion is hereby granted and plaintiffs' cross-motion is denied.

### FACTS

The key facts are not in dispute. Plaintiffs are a majority of the hospital-based radiologists (the "Radiologists") who work in the 17 counties in and around New York City ("Downstate New York").[1] Defendant Empire Blue Cross and Blue Shield, Inc. ("Empire") is a non-profit health insurance corporation organized and existing under Article 43 of the New York Insurance Law. Empire is the product of a merger of Blue Cross/Blue Shield of Greater New York, Inc., which served Downstate New York, and Blue Cross of Northeastern New York, Inc., which served the Northeastern New York area.

Empire offers two basic insurance plans: "Blue Cross," which covers certain defined hospital services and benefits, and "Blue Shield," which covers certain professional medical services provided by physicians. An individual or group may purchase one plan without purchasing the other; that is, one may purchase both Blue Cross coverage and Blue Shield coverage, Blue Cross

coverage without Blue Shield coverage or Blue Shield coverage without Blue Cross coverage. Empire provides Blue Cross hospital service benefit coverage to more than 9 million covered persons. Some of these individuals buy partial hospital benefit coverage from Blue Cross, and supplemental hospital benefit coverage from others.

In order to provide inpatient hospital services pursuant to these subscriber contracts, Blue Cross entered into contracts with hospitals whereby the hospitals accept payments from Blue Cross as full reimbursement for covered services rendered to Blue Cross subscribers (*i.e.*, the hospitals may not seek to collect additional charges from Blue Cross' subscribers). Since Blue Cross' founding over 50 years ago, the Downstate New York hospitals have provided technical (and, as they developed, professional) radiology services to Blue Cross subscribers as covered hospital services. See Defendant's Rule 3(g) Statement, ¶ 7; Supplement to Plaintiffs' Rule 3(g) Statement, ¶ 7.

Radiology services were usually provided by hospital employees until the 1970's. In the 1970's, as radiology developed as a specialty, many radiologists chose to become independent contractors to hospitals rather than to be hospital employees, although they continued to practice on the hospital premises. At the same time, the Radiologists began to seek to bill Blue Cross subscribers directly on a fee for service basis rather than to bill the hospitals, which in turn bill Blue Cross. In most areas Blue Cross has acquiesced, and no longer requires hospitals to offer radiology services as part of a package of hospital services. In those areas, Radiologists either bill patients directly or bill their medical insurance plans.

1. Radiologists are licensed physicians who have completed special residency programs in radiology and have thereby become qualified in that particular medical specialty. The Second Amended Complaint defines radiology as "the medical specialty concerned with the diagnostic and therapeutic use of X-rays, radium rays and other forms of radiant energy or its equivalent, in the diagnosis and treatment of disease or injury." Second Amended Complaint, ¶ 5. The radiology services that plaintiffs seek to exclude from coverage in Blue Cross' hospital coverage contracts are non-interventional (*i.e.*, non-surgical) inpatient diagnostic and therapeutic radiological services. For ease of reference, these will be referred to simply as "radiology services."

In the 17 downstate counties in New York, however, Blue Cross insists that hospitals that contract with Blue Cross continue to offer radiology services to Blue Cross subscribers as part of a package of hospital services. The Radiologists claim that this practice has the effect of "unnaturally" limiting how much they can charge for their services. That is, they could charge patients more if they could bill patients directly, by-passing both hospitals (whose charges are closely monitored by a number of regulatory agencies, state and federal) and Blue Cross (whose purchasing power permits it to drive a hard bargain).[2] The Radiologists also point out that they feel demeaned by their inability to bill in the same manner permitted to other physicians. Second Amended Complaint, ¶ 29. Recognizing, as they must, that the antitrust laws provide no remedy either for being professionally demeaned or for not being able to charge as much as one would like, the Radiologists attempt to bring their claim within the ambit of the antitrust laws in two ways.

First, the Radiologists claim that the agreement between Blue Cross and each hospital results in price fixing which unreasonably restrains trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Second, they claim that Blue Cross' ability to extract favorable terms from hospitals results from Blue Cross' enormous purchasing power, and that Blue Cross is (1) using its purchasing power to monopolize the hospital service and benefit insurance market, and (2) leveraging its power in the hospital service and benefit insurance market to give a competitive advantage to its affiliate, Blue Shield, in the medical service market—all to the alleged detriment of other insurers and health maintenance organizations, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**2.** According to Radiologists, they could bill $25 million more per year in Downstate New York if they could bill patients directly.

**3.** *NCAA v. Board of Regents,* 468 U.S. 85, 107, 104 S.Ct. 2948, 2963, 82 L.Ed.2d 70 (1984); *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Broadcast Music Inc. v. Columbia Broadcasting*

## DISCUSSION

### 1. Sherman Act § 1

Recent Supreme Court decisions suggest that a court should begin its antitrust analysis with a threshold examination of an alleged restraint.[3] If the alleged restraint appears clearly anticompetitive, a court should find the restraint to be *per se* unlawful; if the alleged restraint may be necessary to achieve a pro-competitive result, a court should test the restraint by the rule of reason. The restraint here is not clearly anticompetitive, and may be necessary to achieve a pro-competitive result. Blue Cross produces lower prices for consumers by using its bargaining power to purchase radiology services as part of a bundle of hospital services. The challenged agreements are ancillary to Blue Cross' attempt to design efficient insurance coverage for subscribers, and may counter what has been characterized by several commentators as a historical insensitivity of physician prices to competition. *See* "Joint Provider Activities Affecting Price," ABA Antitrust Section Draft Working Paper 4–10, 73–75 (1989); Note, *Prepaid Prescription Drug Plans Under Antitrust Scrutiny: A Stern Challenge to Health Care Cost Containment,* 75 Nw.U.L.Rev. 506, 518 n. 69, 524–525; D.W. Kallstrom, *Health Care Cost Control by Third Party Payors: Fee Schedules and the Sherman Act,* 1978 Duke L.J. 645, 647–649 (1978); *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross and Blue Shield of Connecticut, Inc.,* 675 F.2d 502, 506 (2d Cir.1982) (reference to "the normal insensitivity of drug prices"). The agreements permit a sophisticated buyer, Blue Cross, to monitor and predict charges, and permit it to offer cost containment as a service to its less sophisticated, individual subscribers.[4] *See*

*System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed. 2d 1 (1979); 7 P. Areeda, Antitrust Law ¶ 1511, at 431 (1986).

**4.** Kallstrom wrote, eleven years ago:
Given the chance to run their natural courses, market incentives should draw insurance companies into the business of offering cost containment as a service to health care con-

*Prepaid Prescription Drug Plans, supra,* at 524; *Kallstrom, supra,* at 649. In 1982 the Second Circuit held that similar conduct was properly analyzed under the rule of reason. The Court held that in determining whether a restraint is unreasonable, a court must analyze

> whether, under all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint, the restrictive practice imposes an unreasonable restraint on competition.

*Medical Arts,* 675 F.2d at 504.

The Radiologists claim that the agreements between hospitals and Blue Cross restrain competition in violation of Sherman Act Section 1 by preventing the Radiologists from billing directly patients who are Blue Cross subscribers.[5] This claim is similar to ones asserted over the past fifteen years by other providers of goods and services to insurers. Health care providers, in particular, dismayed by the diminution of their market power vis-a-vis buyers representing large numbers of patients, have recently attempted numerous antitrust attacks upon insurers. Courts have consistently rejected, in the health insurance context, the argument advanced in many of these attacks that the antitrust laws give providers of goods and services a right to bill directly patients who are Blue Cross or Blue Shield subscribers. Doctors and pharmacies, among others, have sued health insurers for refusing to let them bill patients directly amounts *in addition* to those the doctors and pharmacies receive from the insurers. Courts have consistently held that this "ban on balance billing" does not unreasonably restrain trade; the only restraint is the one that flows inevitably and properly from the choice by the insurer to buy services and products of a particular type from doctors and pharmacies, *i.e.,* fully-paid services and products.[6] *Medical Arts,* 675 F.2d 502 (Blue Shield may require pharmacies to accept Blue Shield payments as full reimbursement for drugs sold to Blue Shield subscribers);

---

sumers. That insurance companies have not already undertaken to provide this service indicates that market forces have not been permitted to operate freely. At every turn in the road to cost-control innovation insurers have been faced with barriers, often in the form of restrictive practices of organized medicine or of legislation created at the behest of the medical establishment. [Footnote omitted.] *Kallstrom, supra,* at 649.

**5.** Two other arguments made by the Radiologists in connection with their Section 1 claim have no basis in antitrust, and a third will be assumed by the Court to be correct for purposes of this motion. The argument that Blue Cross and hospitals "are not legitimately concerned with physicians' fees" has no basis in antitrust, unless it is an attack on Blue Cross' ban on direct billing, dealt with *infra*, pp. 711–13. Similarly, there is no antitrust basis for the argument that it is unreasonable for Blue Cross to buy radiology services from hospitals, given that Blue Cross chooses to buy no other physicians' services from hospitals; nothing in the antitrust laws requires buyers to be consistent. The Radiologists also argue that it is contrary to the hospitals' self interest to sell radiology services, given the additional administrative burden that entails; this argument is presumably made in support of the Radiologists' contention that Blue Cross has market power. The Court accepts as true, for purposes of this decision, the contention that Blue Cross has market power. *See* pp. 714–15 *infra.*

**6.** It is difficult to tell from the Radiologists' submissions to the Court whether the Radiologists argue that Blue Cross should not be characterized as a "buyer" because it buys on behalf of subscribers. That argument would be unavailing. For antitrust purposes, Blue Cross is treated as a buyer where it pays the bill and seeks to set the amount to be charged. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 216, 217, 99 S.Ct. 1067, 1075–1076, 59 L.Ed.2d 261 (1979); *Medical Arts,* 675 F.2d at 505; *Kartell, et. al. v. Blue Shield of Massachusetts, Inc., et al.,* 749 F.2d 922, 925, 926 (1st Cir.1984), *cert. denied* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 (1985); *Brillhart v. Mutual Medical Ins. Inc.,* 768 F.2d 196, 199 (7th Cir. 1985); *Michigan State Podiatry Ass'n v. Blue Cross and Blue Shield of Michigan,* 671 F.Supp. 1139, 1152 (E.D.Mich.1987); *Mortensen v. First Federal Savings and Loan Ass'n,* 1975–2 Trade Cas. (CCH) ¶ 60,570 at 67,501 (D.N.J.1975), [1975 WL 972]; *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F.Supp. 230, 233, 238 (N.D.Cal.1981), *aff'd.* 677 F.2d 47 (9th Cir.1982), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 510 (1982); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325 (7th Cir.1986); *Pennsylvania Dental Assoc. v. Medical Service Assoc.,* 815 F.2d 270 (3d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 153, 98 L.Ed.2d 109 (1987); *Blue Cross and Blue Shield of Michigan v. Michigan Assoc. of Psychotherapy Clinics,* 1980–2 Trade Cas. (CCH) ¶ 63,351 (E.D. Mich.1980) [1980 WL 1848].

*Kartell v. Blue Cross of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984) (Blue Shield may require doctors to accept Blue Shield payments as full reimbursement for services sold to Blue Shield subscribers; *i.e.,* Blue Shield may ban balance billing); *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973) (Blue Cross may require hospitals to accept Blue Cross payments as full reimbursement for services rendered to Blue Cross subscribers); *see Quality Auto Body, Inc. v. Allstate Insurance Co.,* 660 F.2d 1195 (7th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982) (auto insurers may require repair shops to accept payment at the "prevailing competitive rate" as full reimbursement for their services). Hence, if Blue Cross had chosen to purchase radiology services directly from the Radiologists, case law would clearly support their right to do so and to ban balance billing to patients.

The only distinctions between the above-cited cases and the instant case are distinctions with no antitrust significance. First, the Radiologists seek to bill patients for their entire fee, rather than the balance over the amount paid by an insurer. The decisions cited above, however, stand for the proposition that the antitrust laws do not prohibit a buyer either from buying for the account of others, or from specifying that the services it buys be fully-paid services. The Radiologists do not have to serve Blue Cross subscribers; if they do so, however, they must accept the payment conditions specified by Blue Cross, that is, all payments must come from Blue Cross, not from the subscribers.

Second, here there is one more intermediary interposed between the physician and the patient, *i.e.,* the hospital.[7] It is difficult to see why this fact should have any antitrust significance. The Radiologists' argument is as follows: Blue Cross insists that hospitals sell it fully paid hospital services, including radiology services; to effect the sale, hospitals must, in their agreements with the Radiologists, forbid the Radiologists to bill patients directly for services sold to Blue Cross through the hospitals; Blue Cross has thereby intervened as a "third force" in the relationship between the hospitals and the Radiologists; the First Circuit's recent *Kartell* decision states (in *dictum*) that it would be unlawful for a "third force" to "prevent willing buyers and sellers from independently coming together to strike price/quality bargains." *Kartell,* 749 F.2d at 924.[8] Although *Kartell* contains what this Court reads as a jocular reference to a sinister "third force,"[9] there is no authority what-

---

7. The only detriment to the Radiologists that is added by the hospital being an intermediary between the Radiologists and Blue Cross is that hospital costs are subject to governmental regulation that may have the effect of containing costs. *See* Affidavit of James Corcoran, Esq., New York State Superintendent of Insurance, July 12, 1988 (hereinafter "Corcoran Aff."), ¶ 31. This fact has no bearing on the analysis above.

8. Blue Cross raised this argument previously in its motion to dismiss. At that time, the judge to whom the case was then assigned denied the motion to dismiss, holding that the contracts between Blue Cross and the hospitals in this case are expressly excluded from the holding in *Kartell* because Blue Cross was alleged to be a "third force" intervening in the relationship between the Radiologists and the hospitals. *Westchester Radiological Assoc., P.C. v. Empire Blue Cross and Blue Shield, Inc.,* 659 F.Supp. 132 (S.D.N.Y.1987). For the reasons stated in this opinion, I believe that decision was erroneous and contrary to well-established antitrust precedent.

The Radiologists argue that the earlier decision constitutes law of the case and should not be disturbed. However, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.). Furthermore, denial of a motion for summary judgment does not preclude the grant of summary judgment by another judge. *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987); *Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134–136 (2d Cir. 1956) (Hand, J.); Wright, Miller & Cooper, Federal Practice and Procedure § 4478 (1981).

9. Counsel for the Radiologists are unaware of any case holding that an insurer acted as a "third force" under *Kartell.* Transcript of Oral Argument, January 5, 1989 (hereinafter "Tr.") at 24–25.

ever for the proposition that a seller has an *antitrust* remedy where a buyer insists upon buying his services through an intermediary. This is not a case where Blue Cross is preventing willing buyers and sellers from independently striking bargains— the Radiologists and the hospitals are free to strike any bargains they wish with one another. But if they wish to sell to Blue Cross, they must sell Blue Cross the package it wants to buy, and they must agree that the price charged to Blue Cross will be the only charge for the services.

Furthermore, the Radiologists have produced no evidence of any injury to competition flowing from this agreement. When questioned at oral argument, the Radiologists' counsel stated that "[t]he injury to competition is the competition between the defendant and its hospital insurance competitors, and Blue Shield and its medical insurance competitors." Tr. at 3–4. However, at oral argument the Radiologists' counsel admitted that the Radiologists have (1) no evidence that Blue Cross has done anything to prevent its competitors from negotiating with hospitals to buy the same bundle of services that Blue Cross buys (Tr. at 8),[10] (2) no evidence that Blue Cross has attempted to control agreements between the hospitals and other insurers (Tr. at 9–10), (3) no evidence that Blue Cross interferes in any way with the relationship between the radiologists and patients who are not covered by Blue Cross (Tr. at 10–12),[11] and (4) no evidence that Blue Cross directly tells, or even suggests to, the hospitals what to pay radiologists (Tr. at 12–13).[12] The Radiologists' sole contention is that because of Blue Cross' market power, Blue Cross is able to get better terms for its subscribers than are other insurers. This is insufficient to make out a Section 1 claim. Blue Cross is simply acting as a rational buyer attempting to get the best possible terms for its subscribers.[13]

Finally, as in the *Kartell* case, there are additional circumstances here that favor applying traditional antitrust principles, rather than stretching to create new causes of action.

First, the Blue Cross system under attack here promotes cost containment in an area in which the government has recognized the need for cost containment. There has been a growing governmental realization that traditional ways of paying for health care provided little or no incentive for efficiency and were inherently inflation-

---

10. The Radiologists cited no evidence in their papers or at oral argument that any of Blue Cross' competitors asked to buy from any hospital the same bundle of services that Blue Cross buys (Tr. at 6–7). Subsequent to oral argument, the Radiologists submitted the affidavits of a vice president at each of two hospitals (Affidavit of James Pierce, January 23, 1989; Affidavit of Sylvia Holtzberg, January 24, 1989). James Pierce attests that three health organizations sought the same terms as Blue Cross, and his hospital refused. Sylvia Holtzberg attests that one organization asked her hospital to include the services of hospital-based physicians within the services provided to subscribers, and was refused. Neither affidavit explains why the hospitals refused, and neither affidavit claims that Blue Cross was in any way involved in the hospitals' decision.

11. The Radiologists concede that when a hospital-based radiologist treats a patient who is *not* a Blue Cross subscriber, Blue Cross' contracts with the hospitals have *no impact* on the radiologist's ability to direct-bill that patient. Plaintiffs' Memorandum of Law in Opposition, p. 12. It is only when a hospital-based radiologist provides services to a Blue Cross subscriber that the radiologist is forbidden to direct-bill patients.

12. Furthermore, although Blue Cross makes the decision to include or exclude radiology services in its Blue Cross coverage, the evidence is clear that Blue Cross does not unilaterally fix the price of the hospital services as the Radiologists claim; New York State sets the price. See pp. 714–15 *infra*.

13. *See, Brillhart,* 768 F.2d at 201:

The antitrust laws do not prohibit a buyer from bargaining for the best deal possible. As the district court noted, the conduct by Blue Shield in the present case is not the type of conduct that the antitrust laws were intended to prohibit. This conclusion is especially true where there is no suggestion that Blue Shield ever conspired with any other health care insurer to set prices, where nonparticipating doctors remain free to charge their patients whatever price that they choose, and where participating doctors remain free to charge non-Blue Shield subscribers whatever price they choose. In sum, the provider agreement in this case does not violate the antitrust laws.

ary. According to the United States Department of Health, Education and Welfare, "[p]robably the principal factor contributing to inflation has been the predominant system of third party reimbursement based on what institutions spend and what physicians charge."[14] Recognizing the need for government action to promote cost containment, legislatures, including Congress and the New York State legislature, have adopted prospective payment systems for hospitals. Pursuant to these systems, the appropriate amount of reimbursement to a hospital for certain patient care is determined *before* the care is rendered, giving hospitals a strong incentive to contain costs. Similarly, the executive branch has recognized the need for cost containment in the health care field. In 1982, the Department of Justice Antitrust Division gave a favorable Business Review Letter to 160 not-for-profit hospitals (which represented 80% of all such hospitals in Ohio) who wanted to increase their market power by banding together to purchase hospital products jointly. The Department of Justice noted with approval that this joint buying scheme might enable the group to obtain lower prices, resulting in further cost containment by hospitals.[15]

Second, the Blue Cross purchasing system attacked here is supervised by state regulators. Although that supervision may or may not rise to the level needed to invoke the state action exception to the antitrust laws,[16] there is no dispute that New York State sets the reimbursement rate that Blue Cross may pay to hospitals for patient care:

> Blue Cross rate setting methodology is required by law to be consistent with the Medicaid rate setting methodology prescribed by the state. This means that Blue Cross can pay hospitals neither more nor less than the rate established by state law, as determined by the [New York State] Department [of Health].

Affidavit of Raymond Sweeney, Director of the Office of Health Systems Management of the New York State Department of Health, July 11, 1988 (hereinafter "Sweeney Aff."), ¶ 14. In addition, the Superintendent of Insurance must (1) approve Blue Cross' subscriber contracts for hospital or medical coverage, N.Y.Ins.L. § 4308(a), (2) approve Blue Cross' subscriber premiums or the rating formula from which premiums are determined, N.Y.Ins.L. § 4308(b), and (3) hold a public hearing on any proposed community rate increases for hospital and medical coverage, N.Y.Ins.L. § 4308(c). *See,* Corcoran Aff. at ¶¶ 5–7. The state's supervision suggests that novel judicial applications of antitrust law are unlikely to be required to prevent Blue Cross from abusing its market power.

Third, to the extent that consumer welfare is the goal of antitrust,[17] a court should be hesitant to extend antitrust law to strike down a system that currently saves consumers about $25 million a year in radiology fees.[18]

Thus, Blue Cross has not violated Section 1 of the Sherman Act as alleged in the Radiologists' first claim for relief. The Radiologists' First Claim for Relief is hereby dismissed.

## 2. Sherman Act § 2

■ The Radiologists also contend that Blue Cross' agreements with hospitals constitute monopolization or attempts to monopolize in violation of § 2 of the Sherman Act. For purposes of this motion, the Court will assume that Blue Cross has sig-

---

14. United States Department of Health, Education and Welfare, Forward Plan for Health: Fiscal Years 1978–82, at 34 (1976).

15. Justice Department Business Review Letter from William F. Baxter, Assistant Attorney General, Antitrust Division, to B. William Dunlap, Ohio Hospital Association (June 9, 1982).

16. Because I hold that the alleged conduct does not violate the antitrust laws, I need not reach the issue of whether Blue Cross would have a valid state action defense and make no decision thereon.

17. See *NCAA v. Board of Regents,* 468 U.S. at 107, 104 S.Ct. 2963; *Reiter v. Sonotone Corp.,* 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 486 n. 10, 97 S.Ct. 690, 696 n. 10, 50 L.Ed.2d 701 (1977); R. Bork, *The Antitrust Paradox* 7–9 (1978).

18. "The real danger for the law is less that predation will be missed than that normal competitive behavior will be wrongly classified as predatory and suppressed." Bork, *supra,* at 157.

nificant market power as a purchaser of hospital benefits and services.[19] The Radiologists argue that Blue Cross' use of its market power to extract favorable prices from hospitals has the purpose and effect of (1) injuring Blue *Cross'* competitors (other group purchasers of hospital services and benefits), and (2) injuring Blue *Shield*'s competitors (other group purchasers of medical services).

### a. Injury to Blue Cross' Competitors

Even assuming that Blue Cross uses its market power to obtain favorable prices

from hospitals, Blue Cross has not thereby violated Section 2 of the Sherman Act. The law does not prevent a buyer with market power from negotiating a good price, or from specifying what it will buy. "Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold." *Kartell,* 749 F.2d at 925. "Even if the buyer has monopoly power, an antitrust court ... will not interfere with a buyer's (nonpredatory) determination of price.... A legitimate buyer is entitled to use its market power to keep prices down."

In addition, the parties disagree as to the inclusion of "uninsurables" in the number of persons covered by Blue Cross; there is no competition for these community rated subscribers. Blue Cross estimates that 45% of its subscribers are community rated subscribers.

The parties also disagree on the propriety of including Medicare funds in the calculation of Blue Cross' market share. Tr. at 46–47. Part A of Medicare provides hospital insurance coverage for individuals who qualify for monthly Social Security benefits as well as for certain disabled persons. 42 U.S.C.A. § 1395c. Pursuant to 42 U.S.C. § 1395cc(a)(1)(A), Part A providers agree not to charge individuals covered by Medicare for the inpatient services rendered to them. Instead the providers accept reimbursement from the trust fund, in amounts calculated under Medicare regulations by the Health Care Financing Administration or, at the option of the provider, by private organizations under contract with HCFA. These private parties (fiscal intermediaries) act as agents of HHS in administering the Medicare Program.

Blue Cross is an approved Medicare fiscal intermediary. It is therefore responsible for the payment of substantial sums of Medicare funds to the hospitals. However, as a fiscal intermediary, Blue Cross serves only as a "conduit," and cannot resolve policy questions. *Heckler v. Community Health Services,* 467 U.S. 51, 64–65, 104 S.Ct. 2218, 2225–2226, 81 L.Ed.2d 42 (1984). The Radiologists point out, however, that since Blue Cross is the conduit for these funds, Blue Cross can control the timing of Medicare payments to hospitals. Tr. at 53. On the other hand, no hospital is required to select Blue Cross as its fiscal intermediary; at least sixteen hospitals in the Downstate New York area have chosen an approved fiscal intermediary other than Blue Cross.

Finally, the Court notes that it has been suggested that health insurers' bargaining power may not be as great as their size suggests, because pressure from their individual subscribers would prevent them from, *e.g.,* disallowing reimbursement at 90% of the hospitals in an area. "Joint Provider Activities Affecting Price," *supra,* at 74 n. 218.

---

**19.** The Court notes the difficulty in determining Blue Cross' market share. Blue Cross calculates its market share by determining the percentage of hospitals' net inpatient revenues attributable to Blue Cross; Blue Cross estimates its market share to be just over 20% using this calculation. Affidavit of Jerry Weissman, July 27, 1988, ¶ 40. Blue Cross bases its estimate on State Department of Health Reports, which it concedes include hospital revenues from all payors, including donations and payments from governments. Tr. at 46. The Radiologists counter with the deposition testimony of a few hospital administrators who estimate the percentage of their hospitals' total revenues attributable to Blue Cross to be approximately 30%. However, this figure represents Blue Cross' economic power in only a small percentage of the hospitals involved. The Radiologists deposed approximately six hospital administrators, only some of whom were asked about the percentage of funds attributable to Blue Cross; there are more than sixty hospitals in the Downstate area.

The Radiologists agree that the percentage of hospital revenues is the appropriate measure of Blue Cross' economic power over the *hospitals,* but argue that the appropriate measure of Blue Cross' market power vis-a-vis its competitors is the percentage of persons in the Downstate region who are covered by Blue Cross, *or* the percentage of persons in the Downstate region with medical coverage who are covered by Blue Cross. Tr. at 50–52. Using this calculation, the Radiologists estimate Blue Cross' market share at 80% to 90%. However, as Blue Cross pointed out at oral argument, "double counting" is in part responsible for this high market share. Many consumers are covered by more than one hospital insurance policy. Tr. at 56–57, 64. For example, some consumers may purchase 60–day Blue Cross hospital coverage, and supplemental coverage from another company. The Radiologists have counted anyone who has *some* Blue Cross coverage as a Blue Cross subscriber. The parties have not produced the information regarding Blue Cross' competitors' coverage that would be required to eliminate this double-counting (indeed, the information may be unavailable to them).

*Id.* at 929; *see, Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 297 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (analogous conclusion with respect to *sellers* with market power). There is no evidence that Blue Cross has interfered in any way with any competitor's ability to obtain similar terms from sellers. See p. 713 *ante.* In these circumstances, the Radiologists have presented no evidence that Blue Cross' use of its market power to extract low prices was unlawful.[20]

b.  Injury to Blue Shield's Competitors

The Radiologists claim that one of the reasons Blue Cross insists on purchasing radiology services from hospitals is that it wants to use its leverage in one market (the hospital service and benefit insurance market) to gain a competitive advantage in a second market (the medical service insurance market), where its affiliate Blue Shield is weak. For purposes of this decision, the Court will assume that Blue Shield is less successful than Blue Cross.

The Radiologists have offered no evidence that Blue Cross' purpose in insisting on purchasing radiology services for its subscribers is to assist its weaker affiliate Blue Shield, and several facts make this argument implausible. There is no dispute that when a hospital patient has Blue Cross coverage, Blue Cross is always billed for the hospital radiology fees, and those fees are never billed to anyone else (whether the patients subscribe to Blue Shield or to a competitor of Blue Shield). Thus, Blue Shield's competitors benefit from Blue Cross' policy as much as does Blue Shield— none of them pays for radiology services for patients with Blue Cross coverage. Tr. at 33–34.

Second, there is no evidence indicating that (and it is illogical to assume that) consumers would select Blue Shield over a competing insurer because of some differential in premium costs that might result from the fact that Blue Shield does not offer to pay its subscribers' in-hospital radiology bills. Since no medical insurer pays in-hospital radiology bills for Blue Cross subscribers, every medical insurer, not just Blue Shield, can offer two plans: one plan for non-Blue Cross subscribers, that pays in-hospital radiology bills, and a cheaper plan, for Blue Cross subscribers, that does not. The Radiologists admit that in reality Blue Shield's competitors do just that. Tr. at 32. Blue Shield gains nothing vis-a-vis its competitors by the inclusion of in-hospital radiology services in Blue Cross hospital benefits. There is thus no injury to competition in the medical service insurance market. In addition, because it is so unlikely, if not impossible, that Blue Cross' decision to purchase radiology services could injure competition in the medical service insurance market, it is highly improbable that Blue Cross' purpose in purchasing such services is to benefit Blue Shield.[21]

**20.** The Radiologists point to a remark by Mr. Lovett of Blue Cross, to the effect that direct billing by radiologists would imperil Blue Cross' market share (presumably by making Blue Cross coverage less valuable). Minutes of Meeting of Hospital Review Committee of Blue Cross and Blue Shield of Greater New York, April 4, 1984, at 4. Whether or not Mr. Lovett is correct, this statement alone is not probative of any unlawful conduct on the part of Blue Cross. Even if this remark showed an intention on Mr. Lovett's or Blue Cross' part to limit competition, "... an admitted intention to limit competition will not make illegal conduct that we know to be pro-competitive or otherwise immune from antitrust control." 7 Areeda, *supra* ¶ 1506 at 391.

**21.** Faced with the reality that Blue Shield gets no cost advantage from Blue Cross' purchase of radiology services, the Radiologists attempted to reformulate their theory of injury (this new theory was raised for the first time at oral argument on this motion, more than three and one-half years after this litigation began). They now argue that Blue Shield is a less efficient claims handler than its competitors, and that Blue Cross, by shielding Blue Shield from the need to process the Radiologists' bills, harms Blue Shield's competitors by making radiology bills "one area [in] which they do not get to demonstrate their competitive advantage, the better administration...." Tr. at 34. Thus, the Radiologists argue, Blue Shield gains a competitive advantage by having "one less area to screw up in." *Id.* In addition, while acknowledging that all medical insurers benefit from Blue Cross' purchase of radiology services, the Radiologists argue that if medical insurers had to pay radiology bills, the additional burden would be more costly for Blue Shield than for its competitors because Blue Shield is less efficient

In addition, Blue Cross had a policy of purchasing in-hospital radiology services long before Empire acquired Blue Shield in 1978. Thus, Blue Cross' *purpose* in *adopting* this policy could not have been to give Blue Shield an edge over Blue Shield's competitors.[22]

Thus, even assuming that Blue Cross has significant market power, Blue Cross has not violated Section 2 of the Sherman Act as alleged in the Radiologists' second and third claims for relief; accordingly, the Radiologists' Second and Third Claims for Relief are hereby dismissed.

## CONCLUSION

Because I hold that the plaintiffs are not entitled to antitrust relief, I need not reach defendant's McCarran–Ferguson and state action defenses or plaintiffs' cross-motion for partial summary judgment with respect to those defenses. The state law claim must be dismissed for lack of pendent jurisdiction.

Accordingly, defendant's motion for summary judgment is hereby granted; this action is hereby dismissed with prejudice.

SO ORDERED.

than its competitors; Blue Shield would then have to increase its premiums by a greater amount than would its competitors.

The Radiologists have offered no evidence that Blue Shield is less efficient than its competitors. After oral argument, the Radiologists submitted three documents purporting to demonstrate Blue Shield's inefficiency. Plaintiff's Post–Argument Affidavit, Exs. D, E, and F. Although these documents reflect some consumer dissatisfaction with *both Blue Cross and Blue Shield* (eg.: "Both carriers draw particularly heavy criticism on the time required to process claims, . . . ." Plaintiff's Post–Argument Affidavit, Ex. E at VII), none of these documents contains any data concerning Blue Shield's costs or efficiency in comparison to Blue Shield's competitors. Any argument based on an assumption that Blue Shield would be inefficient in handling radiology claims as compared to

Blue Shield's competitors is pure speculation and unsupported by evidence.

In addition, as with the Radiologists' original leveraging claim, there is no evidence that Blue Cross purchases radiology services for the purpose of denying Blue Shield this opportunity to fail.

22. Even if Blue Cross decided in 1978 to *persist* in its long-standing policy, for the purpose of injuring Blue Shield's competitors, its persistence is not paying off. The number of Blue Shield subscribers has declined every year save one since its consolidation with Blue Cross. Defendant's Memorandum of Law in Support of Motion for Summary Judgment, p. 48. Its market share has declined as well. Even the Radiologists' counsel estimates that Blue Shield's market share in the medical service insurance market has fallen from 50% to 30% in the past five or ten years. Tr. at 32.