**SMILECARE DENTAL GROUP, Plaintiff,**

v.

**DELTA DENTAL PLAN OF CALIFORNIA, Defendant.**

**No. CV 93–5437 RG(SHx).**

United States District Court, C.D. California.

July 25, 1994.

Maxwell M. Blecher, Alicia G. Rosenberg, Benjamin D. Nieberg, of Blecher & Collins, P.C., Los Angeles, CA, for plaintiff.

M. Laurence Popofsky, Robert A. Rosenfeld, Matthew L. Larrabee, Esta L. Brand, Laurence A. Weiss of Heller, Ehrman, White & McAuliffe, San Francisco, CA, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

GADBOIS, District Judge.

### I. *Background*

Plaintiff SmileCare Dental Group ("SmileCare"), and defendant Delta Dental Plan of California ("Delta Dental") offer dental health care plans to employers, labor unions, and individuals. According to SmileCare's complaint, Delta Dental sells plans to 60% of all persons with dental coverage, and has enrolled approximately 95% of California dentists as Delta Dental service providers. FAC. ¶¶ 5–6. Delta Dental directly reimburses dentists for services they provide to patients, but under most plans, pays only a portion of the dentist's fee. The patient is responsible for the remainder, called a "co-payment." By contract, Delta Dental dentists promise to collect the co-payments from the patients. FAC. ¶ 8.

Plaintiff SmileCare offers a supplemental dental plan called "SmileCare Coverage Plus." SmileCare sells Coverage Plus to patients already covered by dental plans which provide less than 100% coverage, including those covered by Delta Dental's primary plans. FAC. ¶ 9. Since Coverage Plus pays the patient's co-payment, patients with both Coverage Plus and Delta Dental insurance have 100% coverage.

SmileCare contends that Delta Dental has taken a variety of improper actions designed to eliminate SmileCare's Coverage Plus plan. For example, Delta Dental informs dentists who accept co-payments from Coverage Plus that they have breached their contract with Delta Dental by waiving the co-payment. FAC. ¶ 11. Consequently, Delta Dental, "by some unspecified, mystical calculation, recompute[s] the provider's fee schedule and [pays] the dentist a vastly reduced, non-compensatory sum for the services performed." FAC. ¶ 11. Moreover, Delta Dental allegedly has both threatened and terminated Delta providers who accept SmileCare Coverage Plus co-payments. FAC. ¶ 12.

According to SmileCare, Delta Dental's conduct "denies patients access to the dentist of their choice and to expanded SmileCare services," and "prevents SmileCare from being able to effectively compete in the California dental health plan market [by] produc[ing] a boycott by Delta providers of patients having SmileCare supplemental dental health coverage." FAC. ¶ 20.

SmileCare filed suit, alleging a Sherman Act Section 2 claim and several supplemental state law claims, including tortious interference, trade libel, breach of contract, and violations of the California Health and Safety Code and California Business and Professions Code. On January 24, 1994, Delta Dental moved to dismiss under F.R.Civ.P. 12(b)(6), arguing that SmileCare had not alleged anticompetitive conduct and therefore failed to state a Sherman Act Section 2 claim. This Court agreed, and dismissed SmileCare's complaint without prejudice. After SmileCare filed a first amended complaint, Delta Dental moved to dismiss on the same grounds.[1]

## II. *Standard for Motion to Dismiss*

In general, courts may dismiss a complaint under Fed.R.Civ.P. 12(b)(6) only if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *See, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). When evaluating a Rule 12(b)(6) motion, courts must presume that all factual allegations are true and draw all reasonable inferences in favor of the non-moving party. *Western Concrete Structures Co. v. Mitsui & Co.,* 760 F.2d 1013, 1015 (9th Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Kennedy v. H & M Landing, Inc.,* 529 F.2d 987, 989 (9th Cir. 1976).

■ As SmileCare notes, "summary dismissals of antitrust actions are disfavored." *Western Concrete Structures,* 760 F.2d at 1016. However, whether specific conduct is anticompetitive is a question of *law. Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 368 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 735–36 (9th Cir.1987). Therefore, courts should evaluate allegations of anticompetitive conduct at the F.R.Civ.P. 12(b)(6) stage, and dismiss complaints if they "state[ ] no set of facts which, if true, would constitute an antitrust offense, notwithstanding [their] conclusory language regarding the elimination of competition and improper pur-

pose." *Rutman Wine,* 829 F.2d at 735. In such cases, Rule 12(b)(6) dismissal "especially makes sense because the costs of discovery in [antitrust] actions are prohibitive." *Id.* at 738.

## III. *SmileCare's Sherman Act Claim*

■ Under Sherman Act Section 2, a monopolization claim must allege (1) possession of monopoly power in the relevant geographic and product markets; (2) willful acquisition or maintenance of that power; and (3) antitrust injury. *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 817 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992). An attempt to monopolize claim must allege (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct; (3) a dangerous probability of success; and (4) causal antitrust injury. *Id.* For purposes of this motion, Delta Dental concedes that SmileCare has adequately alleged market power. However, Delta Dental contends that SmileCare fails to allege the requisite anticompetitive conduct. *See Western Concrete Structures,* 760 F.2d at 1017–18 ("[A]ttempt to monopolize and actual monopolization involve, among other things, intentional predatory or anticompetitive conduct."). *See also United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) (stating that market power obtained or preserved "as a consequence of a superior product, business acumen, or historic accident," is not condemned by the antitrust laws); *United States v. Syufy Enters.,* 903 F.2d 659, 668–69 (9th Cir.1990); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 273–75 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

### a. *Anticompetitive Conduct*

■ SmileCare concedes that Delta Dental's patient co-payment requirement is unobjectionable. Delta Dental argues that once one makes that concession, one must also

---

1. This Court has jurisdiction over SmileCare's Sherman Act claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

concede that enforcing the co-payment requirement is not anticompetitive.

This Court agrees with Delta Dental. Mandatory co-payment plans require patients to pay their co-payments themselves, thereby precluding them from obtaining supplemental insurance. However, mandatory co-payment plans are no more inherently anticompetitive than 100% plans or any other ordinary buyer/seller arrangement. Merely agreeing to be a patient's exclusive dental insurer is not, in and of itself, anticompetitive:

> [E]very contract between a buyer and seller has precisely the effect of which [plaintiff] complains. When a buyer contracts with one seller, a second seller no longer has access to the buyer's business to the extent it is covered by their existing contract. This consequence, however, is not unlawful. The [plaintiffs] have confused an agreement to boycott with an agreement to buy and sell services.

*Barry v. Blue Cross of California*, 805 F.2d 866, 871 (9th Cir.1986) (citations omitted).[2]

In fact, both the Ninth and Seventh Circuits have recognized that enforcement of contractual mandatory co-payment provisions is *pro*-competitive, because insurance creates a "moral hazard" by making a patient insensitive to cost:

> Once a person has insurance, he wants the best care regardless of cost—for someone else bears the cost. When, as happens often, the physician rather than the patient makes the important choices, the physician may be inclined to provide all the service for which insurance will pay, knowing that his patient will not resist his recommendation (at least not on account of expense). Yet if every physician supplies more or better care, price must rise, which patients as a group must pay in higher insurance bills.

*Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc.*, 784 F.2d 1325, 1332 (7th

Cir.1986). Mandatory co-payments combat this effect:

> Co-payments sensitize [patients] to the costs of health care, leading them not only to use less but also to seek out providers with lower fees ... which makes medical insurance less expensive and enables employers [and health care plan providers] to furnish broader coverage.... [I]f waiver of co-payments is allowed, [or if the patient does not have to make the payment herself] patients prefer the lower outlays but waivers annul the benefits of the co-payment system. The health insurer wants assurance that the patient has given enough thought to the need for [and price of] this medical care to be willing to pay. Patients who pay nothing have no reason to moderate their demands for medical service, and providers may inflate the bill.

*Davidowitz v. Delta Dental Plan of California, Inc.*, 946 F.2d 1476, 1479 (9th Cir.1991) (quoting *Kennedy v. Connecticut General Life Ins. Co.*, 924 F.2d 698, 699–701 (7th Cir.1991)). *See also Westchester Radiological Assocs. P.C. v. Empire Blue Cross and Blue Shield, Inc.*, 707 F.Supp. 708, 710 (S.D.N.Y.), *aff'd*, 884 F.2d 707 (2d Cir.1989), *cert. denied*, 493 U.S. 1095, 110 S.Ct. 1169, 107 L.Ed.2d 1071 (1990). Thus, an insurer's efforts to force providers to honor their mandatory co-payment contracts *increase* the array of dental plans by making mandatory co-payment plans feasible, thereby giving consumers broader choice, reducing insurance costs, and enabling employers to furnish broader coverage. *Kennedy v. Connecticut General Life Ins. Co.*, 924 F.2d 698, 699 (7th Cir.1991).

A simple example, which this Court provided in its previous order, illustrates the principles described by *Davidowitz, Ball Memorial Hospital*, and *Kennedy*. Suppose that Delta Dental expects to pay providers $250 per year for treating a patient who is 100% covered. Ignoring administrative costs and overhead, Delta Dental must charge at least $250 to break even. Suppose also that Delta

---

**2.** The *Barry* plaintiffs, two physicians who were not Blue Cross providers, "argue[d] that the [Blue Cross] Plan has the consequence of boycotting or shutting out nonparticipating physicians by interfering with their access to patients in-

sured by the Plan." 805 F.2d at 871. Nevertheless, Judge Ideman granted summary judgment for Blue Cross, and the Ninth Circuit affirmed, concluding that Blue Cross's actions were not anticompetitive.

Dental discovers that due to the moral hazard, this patient would seek less dental care, say, $200 per year, if he is forced to make a 20% co-payment himself. Under this 20% co-payment plan, Delta Dental would pay providers only $160 per year. Now suppose this patient, covered by Delta Dental's 20% co-payment plan, purchases a Coverage Plus plan from SmileCare, which agrees to pay his co-payments. This patient, who would have sought only $200 in dental care without Coverage Plus, is now no longer deterred by co-payments. Consequently, he seeks $250 in dental care, forcing Delta Dental to pay providers $200 per year, $40 more than it expected. SmileCare and the patient pocket Delta Dental's loss. Of course, this windfall will be short-lived: Unless Delta Dental is allowed to treat supplemental plan payments as impermissible waivers of patient co-payments, it will soon abandon mandatory co-payment plans as unprofitable.[3]

SmileCare acknowledges the moral hazard,[4] and does not ask this Court to repudiate *Davidowitz, Ball Memorial Hospital,* and *Kennedy.* Instead, SmileCare argues that supplemental plans are not *waivers* of co-payments, but rather are merely substitutes for them. Such a distinction is incorrect as a matter of law. So long as a patient is not making the co-payments himself, he is desensitized to cost, even though he must pay a premium for the supplemental insurance.

SmileCare also argues that Delta Dental's conduct is anticompetitive because it stamps out supplemental plans. Specifically, SmileCare argues that, if Delta Dental did not "act anticompetitively," patients could obtain 100% coverage by purchasing either (1) a Delta Dental plan with 100% coverage or (2) a Delta Dental co-payment plan and a SmileCare supplemental plan. SmileCare contends that these two options would compete with each other, thereby reducing the price of 100% coverage and increasing output of dental services. By refusing to regard supplemental plan payments as valid co-payments, Delta Dental allegedly insulates itself from this competition.

This theory is also incorrect as a matter of law. SmileCare misunderstands the very definition of competitor—Delta Dental does not compete *with itself.* SmileCare cannot seriously suggest that Delta Dental will cut the price of its 100% plan solely to compete with Delta Dental's mandatory co-payment plan. Absent competition from other primary plans, Delta Dental would simply set the price of *both* plans at monopolistic levels.

Competitive discipline comes not from supplemental plans, but from competing primary plans. Certainly, some employees may already have a Delta Dental mandatory co-

---

**3.** The mandatory co-payment/supplemental plan combination is inherently unstable unless the primary plan provider and the supplemental plan provider collude. Suppose, in the example previously discussed, that Delta Dental is forced to accept payments from SmileCare supplemental plan payments as valid co-payments. Delta Dental will either cease offering the mandatory co-payment plans or increase its price. Delta Dental will have to charge $200 to ensure that it will break even if a patient purchases SmileCare's supplemental coverage. Of course, this renders the mandatory co-payment plan uneconomical for patients who do *not* wish to purchase supplemental plan coverage (these patients would pay $200 for the Delta Dental plan, plus $20 in co-payments, and receive only $200 in services). Thus, insurers can offer supplemental plans which complement another insurer's mandatory co-payment plan only if the insurers agree to split the cost such that neither operates at a loss.

Although such communication would allow complementary supplemental and mandatory co-payment plans to be offered by different plan provider, it would not have any salutary effect. Complementary supplemental plans can be provided by the *same* company offering the mandatory co-payment plan—without incurring the additional transactions costs necessary if *two* different companies offer the complementary plans. Moreover, such communication would have a potentially disastrous effect on the primary plan market, in which Delta Dental and SmileCare compete, by needlessly facilitating price discussions between competitors in the primary plan market. *See generally United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *America Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1932); *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925).

**4.** Both the initial complaint and the first amended complaint concede that if patients have to make co-payments themselves, they will seek fewer dental services. FAC. ¶¶ 17, 22a.; CM. ¶ 9.

payment plan through their employers or labor unions and wish to purchase supplemental coverage so they can be 100% covered. If Delta Dental overcharges for supplemental plans, competitors will induce the patient's employer to switch mandatory co-payment plan providers by promising to charge lower rates to employees who seek supplemental coverage. As long as Delta Dental does not improperly attempt to crush competition in the *primary* plan market,[5] it does not act anticompetitively.[6]

Thus, this Court finds that SmileCare's First Amended Complaint fails to state a Sherman Act claim. A few additional remarks are warranted, however, regarding the boycott and refusal to deal cases upon which SmileCare relies.

b. *"Induced Boycott"—Klor's v. Broadway-Hale*

SmileCare contends that *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) supports its claim that Delta Dental has used its dominant position in the market to coerce or induce third parties—dentists—to "boycott" SmileCare supplemental coverage patients and plans. In *Klor's*, plaintiff, Klor's, Inc., and defendant, Broadway-Hale, were adja-

cent retail stores in San Francisco which sold similar household appliances. Broadway-Hale ran local newspaper ads showing its products and prices. Klor's took copies of these ads, marked down the prices, and posted them in its own windows, thereby luring customers away from Broadway-Hale. In an attempt to stop this practice, Broadway-Hale allegedly convinced several appliance manufacturers and distributors to sell to Klor's only on highly unfavorable terms, if at all. Klor's sued, alleging claims under Sherman Act Sections 1 and 2.

The Supreme Court held that Klor's had successfully alleged Section 1 and 2 violations, remarking that the alleged conspiracy "takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in defendants' products." *Klor's*, 359 U.S. at 213, 79 S.Ct. at 709. However, *Klor's* did not forbid Broadway-Hale from acting to enforce *procompetitive* contracts with Broadway-Hale. Rather, *Klor's* only forbade a reseller from coercing suppliers not to sell *competing* goods to the reseller's competitor. Because supplemental plans do not provide competitive pressures—an insurer does not compete with itself—SmileCare does not state a claim under *Klor's*.[7]

---

**5.** One cannot speak in terms of an independent supplemental plan "market," because the moral hazard requires supplemental plans and mandatory co-payment plans to be offered by the same insurer. Thus, SmileCare cannot, as a matter of law, complain that the supplemental plan market is not competitive. As discussed above, competition in the primary plan market keeps health insurance prices, including those for supplemental plans, at a competitive level.

**6.** Since SmileCare fails to allege anticompetitive conduct, it also fails to allege antitrust injury. SmileCare alleges that Delta Dental terminates dentists who accept co-payments from SmileCare's coverage plus plan, but Delta Dental does not allegedly tell dentists that they cannot be providers for SmileCare *primary* plans if they want to be Delta Dental providers. While the terminations might harm the dentists, they do not give rise to antitrust injury to SmileCare. So long as no entry barriers preclude SmileCare from competing in *primary* plan market (and SmileCare has alleged none), Delta Dental's alleged practice of terminating dentists who accept co-payments from SmileCare could be expected to *benefit* SmileCare, since patients wishing to

continue treatment from these dentists would be encouraged to switch to SmileCare primary plans. Certainly, some patients might choose to switch dentists instead of dental health care plans, but their decision would harm dentists— not SmileCare.

**7.** Similarly, SmileCare does not state a claim under *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir.), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). Blue Cross, which insured approximately 60% of all Kansas residents, 899 F.2d at 969, terminated its provider contract with a hospital in order to "send a message" to hospitals to boycott Blue Cross' competitors. *Id.* at 954. The jury found for plaintiffs, and the Tenth Circuit affirmed. *Reazin* differs little from *Klor's*—it only forbids a reseller with market power from announcing to a supplier that it cannot sell *competing* goods to a *competing* reseller.

Finally, SmileCare also cites *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). Plaintiff McCready, a Blue Shield subscriber, challenged Blue Shield's practice of unfavorably restricting reimbursement for psychotherapy provided by

c. *"Refusal to Deal"—Aspen Skiing v. Aspen Highlands Skiing*

 SmileCare relies on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), arguing that Delta Dental has improperly refused to deal with the Coverage Plus Plan. Refusal to deal *can* constitute a Section 2 violation, but only in narrow circumstances. Competitors do not generally have a duty to deal with each other. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* — U.S. —, —, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992); *Aspen Skiing,* 472 U.S. at 600, 105 S.Ct. at 2856; *High Technology Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir.1993). Ordinarily, to prevent horizontal price fixing and collusion, the antitrust laws discourage unnecessary communication between true competitors. *See generally United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *America Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1932); *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). Nevertheless, competitors working together may be able to create a new product which neither could offer on their own. In such cases, the combination should be encouraged, so long as it does not lead the competitors to abuse the opportunity and fix prices on their *competing* goods. Thus, if competitors combine to create a new product, and one of them backs out without legitimate business reasons for doing so, it may violate Sherman Act Section 2. *Aspen Skiing,* 472 U.S. at 604–05, 105 S.Ct. at 2858–59; *City of Anaheim v. Southern California Edison Co.,* 955 F.2d 1373, 1379 (9th Cir.1992).

For example, the *Aspen Skiing* litigants, both ski resorts, combined to sell the "all-Aspen" ski pass, a new and superior product. *Aspen Skiing,* 472 U.S. at 605–10, 105 S.Ct. at 2858–61. The all-Aspen ticket provided skiers with greater and more convenient access to ski services, and thus was a *new* and different product which could only be offered by the two resorts in combination. *Id.* Although the all-Aspen ski pass was successful, one of the resorts chose to abandon it, and refused to sell ski passes to the other. The Supreme Court held that the refusal, for which defendant had no justifiable business reason, violated Sherman Act Section 2.

SmileCare's position is only superficially similar to the *Aspen Skiing* plaintiff's. SmileCare's Coverage Plus and Delta Dental's co-payment plans appear to be complementary—when combined, the two plans form a new product, 100% coverage. However, nothing makes this new product special, improved, or even different from a 100% plan offered by a single dental insurer. In fact, considering the added administrative and transaction costs of participating in *two* dental plans, a single 100% plan seems superior. Moreover, unlike the defendant in *Aspen Skiing,* Delta Dental has valid business reasons for refusing to deal, established by *Davidowitz, Ball Memorial Hospital,* and *Kennedy.* Since SmileCare fails to allege that the market gains a new product when a SmileCare supplemental plan and a Delta Dental mandatory co-payment plan are combined, and since Delta Dental has pro-competitive reasons for refusing to deal, SmileCare's *Aspen Skiing* theory fails.

d. *Dismissal With Prejudice.*

In its previous order, this Court informed SmileCare that absent an allegation of an anticompetitive practice or entry barrier, SmileCare's contentions that Delta Dental artificially increases prices makes no sense—so long as others (such as SmileCare) are free to enter the market, prices will remain at a competitive level. SmileCare's amended complaint fails to make any such allegations.

psychologists as compared to psychiatrists. *Id.* at 468, 102 S.Ct. at 2542–43. By a 5–4 majority, the Supreme Court found that McCready had standing to sue Blue Shield for its "concerted refusal to pay ... motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers." *Id.* at 479, 102 S.Ct. at 2548. However, because *McCready* is a standing case, it does not speak in detail of the substance of plaintiff's antitrust claims. This Court declines to read *McCready* as suggesting that absent entry barriers or anticompetitive conduct, resellers must purchase from all available suppliers. Such an absurd reading would render vertical integration, which is usually pro-competitive, illegal.

Nevertheless, SmileCare argues that it should be given an opportunity to conduct discovery. Absent an allegation of anticompetitive conduct, this Court cannot imagine what this endeavor might prove.

"[R]epeating [a] mantra" of familiar antitrust terms does not immunize SmileCare's complaint from attack. *Eastman Kodak,* —— U.S. at ——, 112 S.Ct. at 2084–85 n. 18. *See also Rutman Wine,* 829 F.2d at 736 ("[I]f the facts [alleged] do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust."). Nor does it justify allowing SmileCare to embark upon an expensive fishing expedition, which in and of itself might discourage insurers from offering pro-competitive, mandatory co-payment plans. *See Rutman Wine,* 829 F.2d at 738 (noting that Rule 12(b)(6) dismissal "especially makes sense because the costs of discovery in [antitrust] actions are prohibitive."); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71, 79 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (quoting Cardozo, *Mr. Justice Holmes,* 44 Harv.L.Rev. 682, 688 (1931)) (warning courts to "guard against 'the tyranny of tags and tickets' "—the temptation to immediately embrace a plaintiff's rote recitation of antitrust terms). This Court has already given SmileCare guidance and an opportunity to amend its complaint. Since SmileCare fails to allege any anticompetitive conduct, its Sherman Act Section 2 claim is hereby DISMISSED WITH PREJUDICE.

### IV. *SmileCare's State Law Claims.*

SmileCare's remaining claims, for tortious interference, trade libel, breach of contract, and violations of the California Health and Safety Code and California Business and Professions Code, are state law claims. Since this Court only has supplemental jurisdiction over these claims, and since this Court believes that these claims would be resolved most efficiently in a state court, SmileCare's state law claims are hereby DISMISSED WITHOUT PREJUDICE. 28 U.S.C. § 1367(c)(3); *Levald, Inc. v. City of Palm Desert,* 998 F.2d 680, 692 (9th Cir.

1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 924, 127 L.Ed.2d 217 (1994).

**IT IS SO ORDERED.**